**BALTIMORE TYPOGRAPHICAL UNION NO. 12**

v.

**The A. S. ABELL COMPANY and Washington-Baltimore Newspaper Guild Local 35.**

**Civ. No. K–75–726.**

United States District Court, D. Maryland.

Oct. 28, 1977.

Bernard W. Rubenstein, Baltimore, Md., for plaintiff.

James P. Garland, and Richard T. Sampson, Baltimore, Md., for The A. S. Abell Co., defendant.

Robert E. Paul, Arlington, Va., and Cosimo C. Abato, Baltimore, Md., for Washington-Baltimore Newspaper Guild, Local 35, defendant.

FRANK A. KAUFMAN, District Judge.

Proceeding under Section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185, plaintiff Baltimore Typographical Union No. 12 (Printers) asks this Court to order defendants The A. S. Abell Company (Company) and Washington-Baltimore

Newspaper Guild Local 35 (Guild), to submit certain grievances to binding tripartite arbitration.[1]

## FACTS

The facts in this case are not in dispute. The Company is a Maryland Corporation with its principal place of business in Baltimore, where it is engaged in publishing three newspapers: *The Sun* (daily morning paper), *The Evening Sun* (daily evening paper), and *The Sunday Sun.* Among the various labor unions recognized by the Company as bargaining representatives for various units of its employees are the Printers and the Guild. The within dispute centers around what may appropriately be described as revolutionary changes made by the Company in the manner in which it produces its newspapers. Prior to 1974, the news and editorial departments of the Company produced news copy on typewriters.

Editors then edited the copy with pencils, pens or typewriters and gave that edited copy to copy persons who handcarried it to the composing room. The composing room then distributed that copy to employees operating linotype machines or paper tape punch machines, both of which produced "hot metal" type used in printing the newspaper. In 1974, the Company introduced a computerized method of operation utilizing several Harris 2500 Computers, and completely eliminated its former "hot metal" operation.[2]

As part of the radical change in operations accompanying the introduction of the Production Systems, the Company developed an inhouse maintenance capability to help insure effective operation of the computers. The employees involved in inhouse maintenance are known as the "Production Systems Groups," which consists of a Production Systems Manager, a Senior Assist-

1. Originally, as requested by the Company, this Court stayed the within proceedings after the Company filed a representation petition with the Regional Director, Region 5, of the National Labor Relations Board (NLRB). Following various proceedings before a Hearing Officer and subsequently a three-member panel of the NLRB, that agency dismissed the Company's petition because of lack of any question concerning representation. Thereafter the Company unsuccessfully filed a Unit Clarification petition with the NLRB. While the Company continues to ask this Court to stay its proceedings pending what the Company contends is appropriate disposition by the NLRB, this Court, because there is no reason to believe that that agency will act to resolve and determine the substantive differences among the parties to this case, declines so to do.

2. Under the new method reporters and editors initiate their stories or other copy at video display terminals (VDT) on video typewriters which transmit copy to a computer for storage. The copy then undergoes an editorial review process which also employs VDT display.

The Company describes the process which follows in the following way:

(a) When approved, the copy is electronically transferred to another computer, called the "universal copy desk", at which it undergoes final editing and is given a headline, again through use of a VDT terminal. Upon appropriate command, the computer automatically sends the copy to the composing room where phototypesetting machines automatically set the type. At present the Production System consists of five Harris 2500 Systems with back-

up units, including 76 VDT typewriter terminals, some 19 wire service lines connected directly from the wire services into the computer, desk top printers and high speed printers on all three systems in the newsrooms, six Harris 2200 terminals, three APS–4 typesetting machines and related peripheral equipment in the composing room in addition to the computer mainframes themselves.

(b) There are three Harris 2500 Systems installed in the newsroom, designated Systems 1, 2 and 3. The morning newspaper is allocated to System 2 and the evening newspaper to System 3. System 1 is called the universal copy desk, at which copy is edited and stored prior to being electronically transmitted to the composing room. There are two Harris 2500 Systems in the composing room, identified as Systems 4 and 5. System 4 receives all copy transmitted from the newsroom to be released for typesetting on one of the two phototypesetting machines. System 5 is allocated to display advertising and as a backup to System 4. Currently, the only function of employees in the composing room is to paste up cold type pages.

The Guild takes the position that although the universal copy desk does perform editing functions on the copy, the copy desk itself is not a computer, and the employees who do their work at the desk simply utilize the computer VDT system in performing such editing. The Guild also takes the position that it is not correct to refer to System 1 as the universal copy desk. In that connection, the Guild contends that System 1 is used by the desk for editing functions.

ant Production Manager and three Assistant Production Managers. Both the Guild and the Printers claim jurisdiction over

3. The Printers cite Sections 2.05, 2.06, 2.07, 2.08 and 2.09 of their agreement with the Company in effect between January 1, 1974 and December 31, 1976. Apparently, the Guild claims jurisdiction under the preamble, Article I, Sections I and II, and under Article II of its agreement with the Company in effect between June 4, 1973 and June 3, 1975 and thereafter to date. The former provides:

2.05 The Union shall have jurisdiction over the operation and maintenance of the Optical Character Reader (OCR) when this equipment is doing Composing Room work within the jurisdiction of the Union as outlined below:

1. All scanner-ready 1-column (any typeface or size) classified ad copy originally keystroked by employees of the classified department of the Publisher not covered by this agreement will be accepted and processed by employees covered by this agreement. However, no typing pool will be created or used to prepare scanner-ready copy. Copy received by the Publisher which is not scanner-ready shall be typed and prepared for the scanner by employees covered by this agreement. After release for typesetting, all corrections will be performed by employees covered by this agreement. Full page classified pages generated by the computers software and transmitted to a phototypesetting machine will be processed by employees covered by this agreement.

2. All display advertising including Back Page, Front Local Page and Front Real Estate Page will be keyboarded by employees covered by this agreement.

3. Clippings, legals and auction ads when received from the outside will be keyboarded by employees covered by this agreement.

4. Scanner-ready editorial copy originally keystroked by editorial employees of the Publisher not covered by this agreement will be accepted and processed by employees covered by this agreement. However, no typing pool will be created or used to prepare scanner-ready copy. Copy received by the Publisher which is not scanner-ready shall be typed and prepared for the scanner by employees covered by this agreement. After release for typesetting, all corrections will be performed by employees covered by this agreement.

5. Any wire service copy and syndicated copy received by the Publisher scanner-ready will be accepted and processed in the composing room. However, no typing pool will be created or used to prepare scanner-ready copy. Copy received by the Publisher which is not scanner-ready shall be typed and prepared for the scanner by employees

those employees by virtue of the respective separate labor-management agreements between them and the Company.[3] Both con-

covered by this agreement. After release for typesetting, all corrections will be performed by employees covered by this agreement.

6. All coding for Display ads including multiple column classified copy and external cover coding will be performed by employees covered by this agreement.

7. Nothing shall prevent the use of factory representatives or outside technicians for the installation or maintenance of OCR equipment requiring special technical skills, when employees covered by this agreement competent to perform the work are not available.

8. All other keyboarding, proofreading, and work not excluded above shall continue to be performed by employees covered by this agreement.

2.06 Employees covered by this agreement shall operate and maintain CRT/VDT terminals used to perform work within the jurisdiction of the Union as outlined below:

1. All work pertaining to and the processing of display advertising on CRT/VDT terminals will be performed by employees covered by this agreement.

2. Page makeup from dummies or layouts on CRT/VDT terminals shall be performed by employees covered by this agreement.

3. The parties further agree that the reference to jurisdiction in this agreement does not include the operation or maintenance of CRT/VDT's in the editorial or classified departments for editorial functions (including the editing on terminals of wire services without edited hard copy) prior to release for typesetting.

4. The classified advertising department may utilize CRT/VDT terminals to originate, update and modify one column (any typeface or size) classified ads from storage, but before release for typesetting.

5. It is agreed that no typing pool will be created or used to prepare any copy or perform any of the work mentioned above.

6. Nothing shall prevent the use of factory representatives or outside technicians for the installation or maintenance of CRT/VDT equipment requiring special technical skills, when employees covered by this agreement competent to perform the work are not available.

7. All other keyboarding and proofreading and work not excluded above shall continue to be performed by employees covered by this agreement.

2.07 It is agreed that when a computer is performing composing room work, the Union's jurisdiction includes the preparation of input

and all handling of output, operation of the computer and all input and output devices, programming (except that programming which is provided by the manufacturer or lessor as part of the standard services for the lease or purchase of the equipment), and maintenance of all the foregoing equipment and devices. Nothing shall prevent the use of factory representatives or outside technicians for the installation or maintenance of equipment requiring special technical skills, when employees covered by this Agreement competent to perform the work are not available.

2.08  Programming is defined as follows:

1. That systems analysis and functional flow charting are not covered by this agreement.

2. Where any work defined in (1) above is to be implemented as a computer operation, a detailed flow chart shall be created by an employee covered by this agreement as well as coding or such other steps as may be necessary to make a program operational.

3. Any detailed flow chart prepared under (2) above may be edited, modified or redrawn by experts not covered by this agreement.

2.09  When a computer is utilized for composing room work the Publisher agrees to make arrangements for the training of journeymen in programming and other computer operations within the Union's jurisdiction, including maintenance, making selections with due regard to aptitude and ability.  Suitable tests may be given to assist in making such determination. Journeymen assigned to such training who fail to attain competency may, at the option of the foreman, be permitted to continue training or be returned to their former status without loss of priority.  After the initial person or persons are trained, additional trainees shall be selected and tested as above in priority order from composing room employees wishing this training. The Guild's contract provides:

THIS AGREEMENT is made this 1st day of July, 1975, between THE A. S. ABELL COMPANY, publishers of The Sun, The Evening Sun and The Sunday Sun, hereinafter known as the Publisher, and the WASHINGTON–BALTIMORE NEWSPAPER GUILD, a local chartered by The Newspaper Guild AFL–CIO, hereinafter known as the Guild, for itself and on behalf of all employees of the Publisher in the editorial and news departments, and library (NLRB Case 5–RC–104); also the commercial departments described in NLRB Case 5–RC–1002, except as hereinafter provided.

## ARTICLE I
### Recognition

1. The Publisher recognizes the Guild as the sole and exclusive collective bargaining agent for the employees covered by this agreement.

\*     \*     \*     \*     \*     \*

## ARTICLE II
### Exceptions

All employees excluded from the bargaining unit in NLRB Case 5–RC–104 and NLRB Case 5–RC–1002 either by current agreement or by order of the Board shall be exempt from the provisions of this Agreement, to wit:

President; Two Assistants to the President; Special Assistant to the President; Vice President; Editor-in-Chief; Editor, The Sun; Editor, The Evening Sun; Deputy Editor, The Sun; Deputy Editor, The Evening Sun; Managing Editor, The Sun; Managing Editor, The Evening Sun; and confidential secretaries to all the foregoing; Assistant to the Managing Editor, The Evening Sun; Head of Universal Art Department; Sunday Editor; 2 Assistant Sunday Editors; Director of Photography; 3 Assistant Managing Editors, The Sun; 2 Assistant Managing Editors, The Evening Sun; News Editor, The Sun; News Editor, The Evening Sun; Foreign Editor, The Sun; National Editor, The Sun; Perspective Editor, The Sun; Feature Editor, The Sun; Feature Editor, The Evening Sun; State Editor, The Evening Sun; Telegraph Editor, The Sun; Telegraph Editor, The Evening Sun; Chief of Copy Desk, The Sun; Chief of Copy Desk, The Evening Sun; City Editor, The Sun; City Editor, The Evening Sun; 4 Assistant City Editors, The Sun; 3 Assistant City Editors, The Evening Sun; Sports Editor, The Sun; Sports Editor, The Evening Sun; 2 Assistant Sports Editors, The Sun; 2 Assistant Sports Editors, The Evening Sun; Employees of the Washington Bureau working in or based in Washington; Chief Librarian.

General Manager; Business Manager; Assistant Business Managers; Director of Corporate Development; Labor Relations and Personnel Manager; Director of Employee Training and Development; Treasurer; Secretary; Controller; Advertising Director; Circulation Director; Assistant Circulation Director; Circulation Manager; Production Director; Operations Manager; and confidential secretaries to all the foregoing; Personnel Administrator; Assistant Treasurer; Assistant Controller; Auditor; Assistant Auditor; General Accounts Manager; Head of Payroll Division; Pension and Retirement Administrator; Cashier; Paper Control Manager; Insurance Manager; Office Managers, Advertising Bookkeeping and Advertising Checking; Office Manager and Assistant Office Manager, Data Processing; Data Processing Systems Analyst; Credit Manager; Assistant Credit Manager; Chief Telephone Operator; Associate Advertising Director; Manager, Retail Advertising; 2 Assistant Managers, Retail Advertising; Retail Advertising Sales Manager; Manager, National Advertising; Manager, Display Real Estate Advertising; Manager, Classified Advertising; Supervisor, Classified Phone Room; Supervisor, Classified Inside Sales; Supervisor, Clas-

tracts contain binding arbitration provisions.[4]

sified Telephone Ad Representatives; Classified Advertising Sales Manager; Manager, Commercial Art Department; Advertising Service Manager; Assistant Managers, Advertising Service; Copy Production Manager; Advertising Promotion Manager; Public Relations Manager; Assistant to Public Relations Manager; Assistant Circulation Manager; Circulation Promotion Manager; Circulation Office Manager; Manager, District Advisors; Outside Circulation Department Employees; Manager, Country Circulation; Office Manager, Country Circulation; Manager, Home Delivery; Manager, Customer Relations; Manager, Mechanical Production; Assistant Managers, Mechanical Production; Superintendent of Plant Maintenance; Head Janitor; Purchasing Agent; and Chief Electrician.

The parties agree to the exclusion of the above positions from the jurisdiction of the Guild. Because of the changing structure of employment in the newspaper industry, the Publisher and the Guild shall establish a standing committee empowered during the term of this agreement to review and amend the above list should questions concerning existing or anticipated positions be brought before it.

4. The Printer's contract provides, in part:

CODE OF PROCEDURE

Section 33. It is understood that all questions in controversy concern the contracting parties jointly and are not to be taken up for or against any individual Office or individual employee.

Section 34. If any controversy arises as to interpretation or enforcement of this Agreement and the Scale of Prices, the conditions prevailing prior to the dispute shall be maintained until the controversy has been disposed of as provided herein; provided, that in discharge cases the employee discharged shall not be reinstated until and unless his reinstatement is ordered by the decision herein provided for. In cases where the discharged employee is reinstated the decision shall determine if the employee is entitled to compensation for time lost and the amount thereof and the compensation when so fixed shall be paid to him upon reinstatement.

Section 35. When it becomes evident there is disagreement as to interpretation or enforcement of the terms of this Agreement, the aggrieved party shall address the other party in writing, clearly setting forth the matters in question. An issue is then raised. All correspondence pertaining to any issue in dispute shall be addressed to the President of the Union, as its authorized representative, and to each of the Business Managers of the newspapers individually.

In 1974 or early 1975 the Guild filed a grievance concerning jurisdiction over the

Section 36. The President of the Union and the Business Managers of the newspapers, or their authorized representatives shall meet within two days from the receipt of the letter referred to in Section 35 and shall endeavor to reach an agreement within 5 days thereafter. If they shall fail to agree within five (5) days the dispute shall be immediately referred to the Joint Standing Committee as herein provided.

JOINT STANDING COMMITTEE

Section 37. Immediately after the necessity arises under Section 36 a Joint Standing Committee of four members shall be appointed, two members of said committee to be named by the Union and two members by the Publishers. In case of a vacancy on the said Joint Standing Committee from any cause, said vacancy shall be filled immediately by the appointment of a new member by the party in whose representation on the Joint Standing Committee the vacancy occurs.

The Joint Standing Committee shall meet within five (5) days after a dispute has been referred to it for decision. The decision of the Committee shall be by majority vote and shall be final and binding upon all parties to this Agreement.

If the Joint Standing Committee cannot reach a majority agreement on any dispute, including disputes regarding discharged men, within 10 days (this may be extended by unanimous agreement) from the date on which dispute is first considered by it, at the request of either party hereto, the members of the Committee shall form a Board of Arbitration and shall select a 5th member who shall be a disinterested party and who shall act as Chairman of the Board. Said 5th member may be selected in any manner unanimously agreed upon by the four members. If said four members fail to select a 5th member within 10 days from the date on which either party requested the formation of the Arbitration Board, said 5th member shall be selected from a list obtained from the Federal Mediation and Conciliation Service. In the event the parties do not agree on an individual on this list each party shall eliminate alternately from the list until only one name remains who shall be the fifth member. The party to make the first elimination shall be decided by lot.

The Board of Arbitration thus formed shall proceed with all dispatch possible to settle the dispute. When a dispute goes to the Joint Standing Committee the parties will request that the arbitrator make himself available within thirty (30) days of notification of his selection, and request that he render the award within thirty (30) days after the close of the record. These time periods may be waived by mutual agreement.

Production Systems Group. That grievance was submitted to arbitration.[4A] The Printers subsequently requested the Company and the Guild to terminate their ongoing arbitration and to submit to binding tripartite arbitration. The Guild expressed its willingness so to do, but the Company refused and asserted that the dispute was properly within the jurisdiction of the NLRB. The Company continues to resist

It shall require the affirmative votes of at least three members of the Board of Arbitration to decide the issues and the decision of the Board of Arbitration in all cases shall be final and binding on the parties hereto. The decision of this Board of Arbitration shall be signed by all members thereof, but is legal and binding when signed by a majority.

Section 38. Any claim of either party for money alleged due or payable under the terms of this agreement shall be allowed or disallowed only as of the date of the raising of the issue.

Section 39. The controversies or disagreement which may be referred to the President of the Union and the Business Managers of the newspapers or their representatives or to the Joint Standing Committee, and decided in accordance with the provisions of Sections 33 through 39, shall be limited exclusively and specifically to differences in the interpretation and enforcement of the terms of this contract, including the question of whether, under Section 5, the disputed issue is covered by the terms of this contract, and including the interpretation of all language contained in this contract.

Neither the representatives of the parties, nor the Joint Standing Committee may, by their decision, provide new or different provisions of the contract or scale of prices between the parties.

The General Laws of the International Typographical Union shall not be subject to arbitration under the Code of Procedure, and the interpretation of such laws is the exclusive right of the International Typographical Union. Nothing contained in this paragraph shall limit or impair Section 5 of this contract.

The Guild's contract provides, in part:

ARTICLE XII

Grievance Procedure

1. The orderly collective bargaining relations between the Publisher and the Guild to secure prompt and fair disposition of grievances being an essential consideration for this Agreement, it is agreed that the Guild will not, during the term of the Agreement, cause, sanction, or take part in any strike, sit-down, slow-down, picketing, or any other effort to restrict the publication of the Publisher's newspapers until the procedure hereinafter provided for the settlement of any complaint or grievance arising under this Agreement has been exhausted; and the Publisher agrees not to engage in any lockouts.

2. The Guild shall designate a committee of its own choosing to take up with the Publisher or his authorized agent any complaint or grievance arising under this Agreement. Any complaint or grievance affecting the relations of the employees and the Publisher but not arising under this agreement shall not be subject to arbitration, but may be taken up with the Publisher.

3. Any complaint or grievance shall be investigated by a committee designated by the Guild and if it is found that a meeting with the Publisher is necessary, it will request such a meeting in writing, stating the basis of the grievance or complaint. The Publisher agrees to meet with the Guild committee at a mutually agreed date within 10 days after receiving a request for such a meeting and to enter discussions for the purpose of adjusting such complaint or grievance to the mutual satisfaction of the parties. If after 10 days the parties are unable to agree by mutual consent the discussion may be continued. Meetings to adjust grievances shall be held in accordance with past practice.

4. Any complaint or grievance arising under this Agreement, (except renewal of this Contract) not satisfactorily settled within thirty (30) days (this period may be extended by mutual agreement) of its first consideration may be submitted to final and binding arbitration by either party. Such arbitration shall be conducted pursuant to the voluntary labor arbitration rules of the American Arbitration Association. Matters not submitted to arbitration within 60 days after the initial written notice of grievance to the Publisher shall not at a later date be subject to arbitration, unless the parties mutually agree in writing to extend the 60 days' limitation.

The costs of such arbitration shall be borne equally by the parties, except that no party shall be obligated to pay any part of the cost of a stenographic transcript without express consent.

4A. The Guild takes the position that while an arbitration proceeding was commenced, that proceeding was interrupted by the claim asserted by the Printers and by the within case. It is not necessary for this Court in this opinion further to characterize the said grievance and arbitration proceedings involving the Company and the Guild. In any event, the parties agree that whatever submission to arbitration took place, no arbitration has ever been conducted and no arbitration decision has ever been made in connection therewith.

herein the quest by both unions for binding tripartite arbitration of their substantive differences as set forth *supra.*

## ARBITRABILITY

It is essential that any forum which undertakes to decide the merits of the underlying dispute between the parties have jurisdiction over all three parties; otherwise, no fair and final resolution can be achieved.

In *Transportation-Communication Employees Union v. Union Pac. R.R.*, 385 U.S. 157, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966), a dispute existed among two unions and an employer growing out of "technological progress [which] telescoped two work stations into one."[5] The Supreme Court held that the Railroad Adjustment Board, a statutorily created arbitration board having jurisdiction over the parties and exclusive jurisdiction over the subject matter of their dispute, was required to afford both unions an opportunity to be heard; and, whether or not both unions actually chose to participate, to resolve the entire dispute upon consideration of all collective bargaining agreements involved.

In this case, the NLRB is the only Governmental agency which conceivably has power to resolve the tripartite dispute, and it has declined to decide that dispute on its merits. None of the parties hereto have sought any order from this Court or any Court to require the NLRB to take any action other than it has taken to date.[6] Thus, the issues in this case are different from those present in *Transportation-Communications Employees*, in which there was a statutory basis for compelling tripartite arbitration. Herein the source of any obligation of the Company to submit to tripartite arbitration must be found, if it exists, within the framework of the separate collective bargaining agreements entered into by the Company with the two Unions. In reading and construing those agreements, it is important to keep in mind the remarks of Mr. Justice Black in *Transportation-Com-*

*munications Employees* 385 U.S. *supra* at 160–61, 87 S.Ct. at 371:

A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts which control such private contracts. * * * "[I]t is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. . . . The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant." *United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 578–579, 80 S.Ct. 1347, 4 L.Ed.2d 1409. In order to interpret such an agreement it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements. This is particularly true when the agreement is resorted to for the purpose of settling a jurisdictional dispute over work assignments.

The Congress has provided in Section 203(d) of the Labor-Management Relations Act, 29 U.S.C. § 173(d):

Final adjustment by a method agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement. . . .

Agreements to arbitrate in collective bargaining agreements, moreover, have been broadly and favorably construed by the Courts. In *United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), Mr. Justice Douglas, joined by six members of the Court wrote (at 581–82, 80 S.Ct. at 1352):

Courts and arbitration in the context of most commercial contracts are resorted to because there has been a breakdown in the working relationship of the parties; such resort is the unwanted exception.

---

**5.** Mr. Justice Stewart, joined by Mr. Justice Brennan, concurring at 385 U.S. *supra* at 166, 87 S.Ct. at 374.

**6.** See note 1, *supra.*

But the grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government. Arbitration is the means of solving the unforeseeable by molding a system of private law for all the problems which may arise and to provide for their solution in a way which will generally accord with the variant needs and desires of the parties. The processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement.

Apart from matters that the parties specifically exclude, all of the questions on which the parties disagree must therefore come within the scope of the grievance and arbitration provisions of the collective agreement. The grievance procedure is, in other words, a part of the continuous collective bargaining process. It, rather than a strike, is the terminal point of a disagreement.

The labor arbitrator performs functions which are not normal to the courts; the considerations which help him fashion judgments may indeed be foreign to the competence of courts. "A proper conception of the arbitrator's function is basic. He is not a public tribunal imposed upon the parties by superior authority which the parties are obliged to accept. He has no general charter to administer justice for a community which transcends the parties. He is rather part of a system of self-government created by and confined to the parties. . . ." Shulman, [*Reason, Contract, and Law in Labor Relations*, 68 Harv.L.Rev. 999 (1955)] *supra*, at 1016.

The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it. The labor arbitrator is

usually chosen because of the parties' confidence in his knowledge of the common law of the shop and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment. The parties expect that his judgment of a particular grievance will reflect not only what the contract says but, insofar as the collective bargaining agreement permits, such factors as the effect upon productivity of a particular result, its consequence to the morale of the shop, his judgment whether tensions will be heightened or diminished. For the parties' objective in using the arbitration process is primarily to further their common goal of uninterrupted production under the agreement, to make the agreement serve their specialized needs. The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed.

The Congress, however, has by § 301 of the Labor Management Relations Act, assigned the courts the duty of determining whether the reluctant party has breached his promise to arbitrate. For arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit. Yet, to be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made. *An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.* (footnote omitted) [7]

7. The "positive assurance" test enunciated by Mr. Justice Douglas has recently been applied by the Fourth Circuit in *Lever Bros. Co., v.*

*Int'l. Chem. Workers Union, Local 217,* 554 F.2d 115, 119 (4th Cir. 1976). *See also Local 1434, Int'l. Bhd. of Electrical Workers v. E. I.*

In his concurring opinion, joined by Mr. Justice Harlan,[8] Mr. Justice Brennan observed (*United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, at 570, 80 S.Ct. 1343, 1363, at 1364, 4 L.Ed.2d 1403, 1432):

> [T]he arbitration promise is itself a contract. The parties are free to make that promise as broad or as narrow as they wish, for there is no compulsion in law requiring them to include any such promises in their agreement. The meaning of the arbitration promise is not to be found simply by reference to the interpretation of commercial arbitration clauses. Words in a collective bargaining agreement, rightly viewed by the Court to be the charter instrument of a system of industrial self-government, like words in a statute, are to be understood only by reference to the background which gave rise to their inclusion. The Court therefore avoids the prescription of inflexible rules for the enforcement of arbitration promises. Guidance is given by identifying the various considerations which a court should take into account when construing a particular clause—considerations of the milieu in which the clause is negotiated and of the national labor policy. It is particularly underscored that the arbitral process in collective bargaining presupposes that the parties wanted the informed judgment of an arbitrator, precisely for the reason that judges cannot provide it. * * *

Those principles have been extended to require tripartite arbitration of disputes arising under two separate labor-management agreements with a single employer in *CBS v. American Recording and Broadcasting Ass'n.*, 414 F.2d 1326 (2d Cir. 1969) *aff'g* 293 F.Supp. 1400 (S.D.N.Y.1968). In that case, CBS sought an order in the District Court compelling tripartite arbitration when one union, the American Recording and Broadcasting Association (Association), demanded arbitration of its claim that certain work should be assigned to it after that same work had been assigned by CBS to a second union, Radio and Television Broadcast Engineers Union, Local 1212. The Association moved to dismiss, on the ground, *inter alia*, that the Court lacked jurisdiction to order tripartite arbitration since Local 1212 was a stranger to the contract between CBS and the Association. "The thesis [of the Association] is that separate contracts breed separate grievances and must be submitted to separate arbitrators." 293 F.Supp. *supra* at 1402. Judge MacMahon, sitting in the District Court, rejected that thesis, noting (at 1402) that *United Steelworkers of America v. Warrior and Gulf Nav. Co., supra,* requires that a collective bargaining agreement be governed, when necessary, not by common law principles of contract law, but instead by "a new common law—the common law of a particular industry." Judge MacMahon further wrote (at 1402–03):

> Rational, meaningful and peaceful resolution of work assignment disputes, therefore, demand the appearance before the same tribunal of all of the parties to the dispute, not just the parties to the contract. These considerations undoubtedly underlie the requirement that work assignment disputes under the related Railway Labor Act, 45 U.S.C. § 151 et seq., growing out of a railroad's bargaining agreements with several unions must be submitted to a single panel of arbitrators for resolution, even though one union does not consent to multilateral arbitration. *Transportation-Communication Employees Union v. Union Pacific R.R.*, 385 U.S. 157, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966).
>
> Similarly, if the NLRB were to resolve this dispute, the Association, Local 1212 and CBS would all have to appear before the Board. * * * Likewise, if this court were to resolve the dispute on its merits, all three parties would be present since there are common questions of law and fact. Rule 42(a), Fed.R.Civ.P.

*du Pont de Nemours & Co.*, 350 F.Supp. 462, 466 (E.D.Va.1972) (Merhige, J.).

---

8. Mr. Justice Frankfurter also expressed substantial agreement with Mr. Justice Brennan, 363 U.S. *supra* at 578, 80 S.Ct. 1347.

The Association has not demonstrated any prejudice which would result from consolidating the arbitrations. There is none, because Local 1212 is willing to submit the dispute to an arbitrator of the Association's choosing. The Association cites no case or statute which forbids consolidation of the arbitration, and nothing in its contract with CBS excludes multilateral arbitration of disputes arising under the contract.

Compelling all three parties to the dispute to submit their grievances to the same arbitration is practicable, economical and convenient for the parties and the arbitrator. It is sound because it not only avoids duplication of effort but the possibility of conflicting awards. Considering all the circumstances, we think consolidation of the arbitrations is the appropriate remedy. * * *

In affirming, Judge Waterman, writing for the Second Circuit, first considered (414 F.2d at 1327–28):

whether the district court had jurisdiction to entertain the action by CBS. If § 301 is read literally a negative answer might be reached, for the statute covers suits "for violation of contracts between an employer and a labor organization," and CBS, while seeking to enjoin one arbitration proceeding and to consolidate it with another such proceeding, does not claim that there had been any violation of any labor contract. However, each union claims its contract has been violated. There is ample authority holding that § 301 gives the federal courts broad jurisdiction to deal with many types of controversies that arise between labor and management. [citations and discussions of thesis omitted] Thus, even though the statute only specifically mentions "violation of contracts" federal courts have taken jurisdiction over disputes between unions and employers when no formal contracts between them were in existence. This being so, the district court correctly found it had jurisdiction over a work assignment dispute between two unions when both unions had contracts with the same employer, and the employer, even though it does not claim a violation of either contract, seeks judicial action. Cf. *Transportation-Communication Employees Union v. Union Pacific R.R. Co.,* 385 U.S. 157, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966) (where one of two unions sought judicial intercession under the Railway Labor Act in a tripartite dispute). Surely the taking of jurisdiction by the district court in the present dispute is in line with the overall national policy of furthering industrial peace by resort to agreed-upon arbitration procedures. See, e. g., *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 577–578, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1969), citing *Textile Workers Union of America v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).

Judge Waterman further held that the district court had *power* to order tripartite arbitration, relying largely upon *Transportation-Communication Employees Union v. Union Pacific R.R., supra.* Finally, Judge Waterman held that the district court had not abused its discretion to exercise that power, noting (at 1329):

The contracts that CBS had with ARBA and with Local 1212 contain broad arbitration provisions. Were this not so, we would have a very different situation. Also, though the two contracts provide for different methods of choosing an arbitrator acceptable to the parties, Local 1212 has agreed to arbitrate its dispute before the arbitrator who had been chosen in accord with the method agreed upon by ARBA and CBS to arbitrate their dispute. Therefore, whatever difficulty might have plagued the court if there had been a disagreement among the parties on this point was and is obviated. (footnote omitted)

In this case, both unions have stated they will accept an arbitrator chosen in accordance with the procedures of the American

Arbitration Association and will be bound by his decision.[9]

Recently, in *Bell Aerospace Co. Div. of Textron v. Local 516, UAW*, 500 F.2d 921 (2d Cir. 1974) (Hays, J.), the Second Circuit approved its own earlier holding in *CBS*. *See also* the Third Circuit's citation of *CBS* with approval, albeit in dictum, in *Window Glass Cutters League v. American St. Gobain Corp.*, 428 F.2d 353, 355 (3d Cir. 1970) (Van Dusen, J.). *Cf. Local 416, Sheet Metal Workers v. Helgesteel Corp.*, 507 F.2d 1053 (7th Cir. 1974) (Swygert, C. J.). And *see* Southern District of Missouri in *Local 552, United Brick & Clay Workers v. Hydraulic Press Brick Co.*, 371 F.Supp. 818, 825 (S.D. Mo.1974), involving one union and two employers.

█ The arbitration provisions included in the two contracts in this case are very broad. In the Printer's contract, the grievance and arbitration procedures apply to "any controversy aris[ing] as to interpretation or enforcement of this Agreement . . . ." In the Guild's contract, arbitration is provided for "any complaint or grievance arising under this Agreement."[10] The circumstances of this case are ready-made for the application of *CBS* unless this Court is in disagreement with the doctrine and the approval of that case—which it is not. Rather, this Court finds itself totally in accord with the Second Circuit view.

### MOOTNESS

There remains, however, another issue which requires analysis and decision before tripartite arbitration may be ordered herein. The agreement between the Company and the Printers expired on December 31, 1976 during the course of the within proceedings.[11] Thus the issue of mootness is present. In *Enterprise Wheel & Car Corp. v. United Steelworkers*, 269 F.2d 327 (4th Cir. 1969) (Soper, J.), *rev'd in part* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960),

employees walked off the job in protest of the termination of the employment of another employee. The Company then terminated the "walkers" employment in retaliation for their action. In less than three months after the termination, the contract expired. The Union sought reinstatement; the Company refused. The Union sought arbitration; the Company refused. After the expiration date of the contract, the Union filed suit in federal court and won a Court order requiring arbitration. The arbitrator ordered reinstatement with back pay minus 10 days pay and also minus earnings from other employment after the discharge. The District Court ordered specific performance of the arbitrator's award. On appeal, the Fourth Circuit, speaking through Judge Soper, held that upon expiration of the contract, the right to reinstatement disappeared and also modified the District Court's order to allow back pay only for the period following the termination of employment but *prior to* the expiration of the contract.

The Supreme Court, in the third case in the *Steelworkers* trilogy, reversed the Fourth Circuit. In so doing, Mr. Justice Douglas, wrote (at 596–99, 80 S.Ct. at 1360):

The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards. As we stated in *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409, decided this day, the arbitrators under these collective agreements are indispensable agencies in a continuous collective bargaining process. They sit to settle disputes at the plant level—disputes that require for their solution knowledge of the custom and practices of a particular factory or a

---

9. Both unions have stated their acceptance of all provisions of the Decree set forth *infra*.

10. None of the exclusionary clauses relating to arbitration are relevant to the within dispute.

11. The Guild contract is still in force and effect. *See* n. 3, *supra*.

particular industry as reflected in particular agreements.

When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency. Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

The opinion of the arbitrator in this case, as it bears upon the award of back pay beyond the date of the agreement's expiration and reinstatement, is ambiguous. It may be read as based solely upon the arbitrator's view of the requirements of enacted legislation, which would mean that he exceeded the scope of the submission. Or it may be read as embodying a construction of the agreement itself, perhaps with the arbitrator looking to "the law" for help in determining the sense of the agreement. A mere ambiguity in the opinion, accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award. Arbitrators have no obligation to the court to give their reasons for an award. To require opinions free of ambiguity may lead arbitrators to play it safe by writing no supporting opinions. This would be undesirable for a well-reasoned opinion tends to engender confidence in the integrity of the process and aids in clarifying the underlying agreement.

Moreover, we see no reason to assume that this arbitrator has abused the trust the parties confided in him and has not stayed within the areas marked out for his consideration. It is not apparent that he went beyond the submission. The Court of Appeals' opinion refusing to enforce the reinstatement and partial back pay portions of the award was not based upon any finding that the arbitrator did not premise his award on his construction of the contract. It merely disagreed with the arbitrator's construction of it.

The collective bargaining agreement could have provided that if any of the employees were wrongfully discharged, the remedy would be reinstatement and back pay up to the date they were returned to work. Respondent's major argument seems to be that by applying correct principles of law to the interpretation of the collective bargaining agreement it can be determined that the agreement did not so provide, and that therefore the arbitrator's decision was not based upon the contract. The acceptance of this view would require courts, even under the standard arbitration clause, to review the merits of every construction of the contract. This plenary review by a court of the merits would make meaningless the provisions that the arbitrator's decision is final, for in reality it would almost never be final. This underlies the fundamental error which we have alluded to in *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 1363, 4 L.Ed.2d 1403, 1432, decided this day. As we there emphasized, the question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.

We agree with the Court of Appeals that the judgment of the District Court should be modified so that the amounts

due the employees may be definitely determined by arbitration. In all other respects we think the judgment of the District Court should be affirmed. Accordingly, we reverse the judgment of the Court of Appeals, except for that modification, and remand the case to the District Court for proceedings in conformity with this opinion. (footnotes omitted)

In *Enterprise* the arbitration order had already been entered by the arbitrator before the "mootness" type of issue reached the courts. Herein the mootness question arises in the context of whether this Court should or should not order arbitration. Nonetheless, it can be argued that *Enterprise* establishes the broad principle that the arbitrator is the one to decide whether a collective bargaining agreement, despite its expiration, permits a post-expiration back pay award, and that a reviewing court should not engage in interpretation of the contract in the course of determining whether to exercise its power to order or not to order tripartite arbitration.

Such a broad reading, however, of *Enterprise* requires careful examination in the light of *John Wiley & Sons v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). In that case, a Union sought arbitration of various of its claims under a collective bargaining agreement entered into between the Union and a company which, subsequent to the execution of the contract, had merged with the defendant Company. The agreement did not expressly provide that it was binding upon the employer—corporation's successors. The Supreme Court held that the issues were subject to binding arbitration between the Union and the new (defendant) Company. However, in so concluding Mr. Justice Harlan wrote (at 546, 84 S.Ct. at 912):

The threshold question in this controversy is who shall decide whether the arbitration provisions of the collective bargaining agreement survived the Wiley-Interscience merger, so as to be operative against Wiley. Both parties urge that this question is for the courts. Past cases leave no doubt that this is correct. "Under our decisions, whether or not the

company was bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the parties." *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 241, 82 S.Ct. 1318, 8 L.Ed.2d 462. Accord, *e. g., United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409. The problem in those cases was whether an employer, concededly party to and bound by a contract which contained an arbitration provision, had agreed to arbitrate disputes of a particular kind. Here, the question is whether Wiley, which did not itself sign the collective bargaining agreement on which the Union's claim to arbitration depends, is bound at all by the agreement's arbitration provision. The reason requiring the courts to determine the issue is the same in both situations. The duty to arbitrate being of contractual origin, a compulsory submission to arbitration cannot precede judicial determination that the collective bargaining agreement does in fact create such a duty. Thus, just as an employer has no obligation to arbitrate issues which it has not agreed to arbitrate, so a fortiori, it cannot be compelled to arbitrate if an arbitration clause does not bind it at all. (footnotes omitted)

It can be argued that in *Wiley*, Mr. Justice Harlan did not intimate any intention to discard the approach or the language of Mr. Justice Douglas in *Enterprise*. However, even assuming, arguendo only, to the opposite, the Supreme Court has provided subsequent guidance in *Nolde Bros. v. Bakery Workers*, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977). The issue in that case was described by the Court (at 244, 97 S.Ct. at 1068) as:

whether a party to a collective-bargaining contract may be required to arbitrate a contractual dispute over severance pay pursuant to the arbitration clause of that agreement even though the dispute, although governed by the contract, arises after its termination. * * *

In *Nolde,* the collective bargaining agreement provided for arbitration of "all grievances." The contract was to last until July 21, 1973, and thereafter until termination was noticed. The union called for negotiations in May, 1973, and terminated the contract on August 27, 1973. Negotiations continued until August 31, 1973 when the Company announced its decision to shut down the plant. The Union demanded payment of severance pay under the terms of the agreement; the Company refused. The Union sought arbitration under the contract; the Company refused. The Union, seeking relief in District Court, sought arbitration or alternatively monetary judgment for severance pay. The District Court granted summary judgment for the defendant company on the theory that the contract had expired and with it the rights to severance pay and arbitration. The Fourth Circuit reversed, holding that the duty to arbitrate did not expire when the contract expired, in so far as claims arising under the contract were concerned. The Fourth Circuit declined to express any view on the severance pay claim, leaving that issue to the arbitrator.

Speaking for seven members of the Supreme Court, Mr. Chief Justice Burger affirmed. In so doing, he noted (at 249, 97 S.Ct. at 1071) that the dispute "although arising *after* the expiration of the collective bargaining contract, clearly arises *under* that contract." (Emphases by the Chief Justice.) The Chief Justice after citing several cases including *Wiley, supra,* further wrote (at 250–255, 97 S.Ct. at 1072):

> Our prior decisions have indeed held that the arbitration duty is a creature of the collective-bargaining agreement and that a party cannot be compelled to arbitrate any matter in the absence of a contractual obligation to do so. Adherence to these principles, however, does *not require us to hold that termination of a collective-bargaining agreement automatically extinguishes a party's duty to arbitrate grievances arising under the contract. Carried to its logical conclusion that argument would preclude the entry of a post-contract arbitration order even* when the dispute arose during the life of the contract but arbitration proceedings had not begun before termination. The same would be true if arbitration processes began but were not completed, during the contract's term. Yet it could not seriously be contended in either instance that the expiration of the contract would terminate the parties' contractual obligation to resolve such a dispute in an arbitral, rather than a judicial forum. * * * Nolde concedes as much by limiting its claim of nonarbitrability to those disputes which clearly arise after the contract's expiration. * * *

Our holding in *John Wiley & Sons* is instructive on this matter. There we held that a dispute over employees' rights to severance pay[6] under an expired col-

[6] The parties also disagreed over such matters as seniority rights, welfare security benefits, discharges and layoffs, and vacations. 376 U.S., at 554 n. 7 [84 S.Ct. 909, at 916].

lective-bargaining agreement was arbitrable even though there was no longer any contract between the parties. In their expired agreement, the parties had agreed to submit to arbitration:

> " 'any differences, grievance or dispute between the Employer and the Union arising out of or relating to this agreement, or its interpretation or application or enforcement.' " 376 U.S. at 553 [84 S.Ct. 909, at 916].

The Court had little difficulty interpreting that language to require the arbitration of the Union's post-termination severance-pay claim since that claim was

> "based solely on the Union's construction of the . . . agreement in such a way that . . . [the Employer] would have been required to discharge certain obligations notwithstanding the expiration of the agreement." *Id.,* at 555 [84 S.Ct. 909, at 917].

We thus determined that the parties' obligations under their arbitration clause survived contract termination when the dispute was over an obligation arguably created by the expired agreement. It is true that the Union there first sought to

arbitrate the question of post-contract severance pay while the agreement under which it claimed such benefits was still in effect. But that factor was not dispositive in our determination of arbitrability. Indeed, that very distinction was implicitly rejected shortly thereafter in *Piano Workers v. W. W. Kimball Co.*, 379 U.S. 357 [85 S.Ct. 441, 13 L.Ed.2d 541] (1964), rev'g 333 F.2d 761 (CA7 1964), on the basis of *John Wiley & Sons, supra,* and *Steelworkers v. American Mfg. Co., supra.*[7] We decline to depart from that

[7] In *W. W. Kimball Co.*, the Seventh Circuit found that a dispute over seniority rights under an expired collective-bargaining agreement was nonarbitrable. There the dispute did not arise, nor were arbitration proceedings or an action to compel the same instituted, during the life of the agreement. 333 F.2d, at 762–763.

course in the instant case, for, on the record before us, the fact that the Union asserted its claim to severance pay shortly after, rather than before, contract termination does not control the arbitrability of that claim.

The parties agreed to resolve *all* disputes by resort to the mandatory grievance-arbitration machinery established by their collective-bargaining agreement. The severance-pay dispute, as we have noted, would have been subject to resolution under those procedures had it arisen during the contract's term. However, even though the parties could have so provided, there is nothing in the arbitration clause that expressly excludes from its operation a dispute which arises under the contract, but which is based on events that occur after its termination. The contract's silence, of course, does not establish the parties' intent to resolve post-termination grievances by arbitration. But in the absence of some contrary indication, there are strong reasons to conclude that the parties did not intend their arbitration duties to terminate automatically with the contract. Any other holding would permit the employer to cut off all arbitration of severance-pay claims by terminating an existing contract simultaneously with closing business operations.

\* \* \*

While the termination of the collective-bargaining agreement works an obvious change in the relationship between employer and union, it would have little impact on many of the considerations behind their decision to resolve their contractual differences through arbitration. The contracting parties' confidence in the arbitration process and an arbitrator's presumed special competence in matters concerning bargaining agreements does not terminate with the contract. Nor would their interest in obtaining a prompt and inexpensive resolution of their disputes by an expert tribunal. Hence, there is little reason to construe this contract to mean that the parties intended their contractual duty to submit grievances and claims arising under the contract to terminate immediately on the termination of the contract; the alternative remedy of a lawsuit is the very remedy the arbitration clause was designed to avoid.

It is also noteworthy that the parties drafted their broad arbitration clause against a backdrop of well-established federal labor policy favoring arbitration as the means of resolving disputes over the meaning and effect of collective-bargaining agreements. \* \* \*

The parties must be deemed to have been conscious of this policy when they agree to resolve their contractual differences through arbitration. Consequently, the parties' failure to exclude from arbitrability contract disputes arising after termination, far from manifesting an intent to have arbitration obligations cease with the agreement, affords a basis for concluding that they intended to arbitrate all grievances arising out of the contractual relationship. In short, where the dispute is over a provision of the expired agreement, the presumptions favoring arbitrability must be negated expressly or by clear implication. [Emphasis supplied.]

*Nolde* involved rights to severance pay which accrued during the term of the contract. This case involves a work assign-

ment dispute, a question which is apparently currently the subject of negotiation, at least· insofar as the future is concerned, between the Company and the Printers. Herein however, the grievance was filed and this action instituted by the Printers long before expiration of their agreement with the Company. That was not true in *Nolde*. In *International A. of M. & A. W. Local 2369 v. Oxco Brush Div.*, 517 F.2d 239 (6th Cir. 1975), the Sixth Circuit considered the question of whether when a collective bargaining agreement had expired and the Company had subsequently closed its plant, the union had a valid post-expiration claim for certain vacation pay. Whether or not all of the views expressed by the Sixth Circuit accord with the Supreme Court's subsequent opinion in *Nolde*, the Sixth Circuit (at 243) distinguished the case before it from the within case:

> If the dispute between the parties had arisen while the agreement was in force or if the grievance procedure had been started during the life of the contract, the right to arbitration would not have ended with the expiration of the collective bargaining agreement. *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965); *The Steelworkers Trilogy*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *Textile Workers Union of America v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 923, 1 L.Ed.2d 972 (1957); *Procter & Gamble Independent Union v. Procter & Gamble Manufacturing Co.*, 312 F.2d 181 (2d Cir.), cert. denied, 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053 (1962).

In *Procter & Gamble Independent Union v. Procter & Gamble Manufacturing Co.*, 312 F.2d 181 (2d Cir. 1962), another case in which certain of the views expressed may or may not have viability after *Nolde*, the Second Circuit (Judge Hays) held that a company was not obligated to arbitrate grievances arising as a result of certain disciplinary action taken by it with respect to certain employees where the disciplinary actions, and the demands for arbitration, all took place after the collective bargaining agreement had expired and before the effective date of the new agreement. In so holding, Judge Hays, however, also seemingly distinguished (at 186) the present case from the case then before the Second Circuit:

> Grievances which are based upon conditions arising *during the term of the agreement to arbitrate* are arbitrable after that term has ended. * * * (Emphases by Judge Hays)·[12]

The arbitrator who conducts the tripartite arbitration which this Court will order herein has the power and the duty to bring "his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency." *Enterprise Wheel & Car, supra*, 363 U.S. at 597, 80 S.Ct. at 1361 (1960).

Additionally, as the Court of Appeals of New York wrote, in *Utility Laundry Service, Inc. v. Sklar*, 300 N.Y. 255, 90 N.E.2d 178, 180 (1949):

> An agreement to arbitrate "any and all controversies" arising under a contract will be construed as affording "authority to assess damages against the party in default." (citation omitted)

█ Herein, the arbitrator may determine that members of the Printers would have earned additional overtime, or that other members of the Printers should have been hired. In those or in other conceivable circumstances, an arbitrator may decide to grant monetary awards. While it is true that the labor-management relationships involved herein may well be ultimately settled by future negotiations, the scope of the determinations by the tripartite arbitrators, in addition to the possible award of mone-

---

**12.** The underlined words of the Chief Justice, used in *Nolde* in 1977, which appear at p. 609 *supra*, reflect the correctness of the views expressed earlier in *Oxco* and *Procter & Gamble*.

tary damages, cannot and should not be circumscribed in advance by this Court or by the Company or either Union. In sum, the within quest of the Unions for tripartite arbitration is not moot.

RELIEF

The Company contends that, even if tripartite arbitration is ordered by this Court as to the work assignment dispute, and assuming arguendo only that the arbitrator finds some violation of one or both of the agreements by one or more parties, the issue of what relief is appropriate should be reserved for decision during a second tier of separate bipartite arbitration. The Company argues that, otherwise, the jurisdictional and substantive issues before the tripartite arbitrator will be needlessly complicated and that the proceedings will be unnecessarily protracted. Those contentions are rejected. Two tiers of arbitration, rather than one, are, it would seem, only likely to cause the increased complications and delays which the Company states that it fears. Moreover, the arbitrator requires and should be given all of the discretionary authority tools he needs to bring about resolution on the merits of the disputes in this case.

This Court will today issue a Decree in accordance with this Opinion.