**BARTLETT & COMPANY, GRAIN, Plaintiff,**

v.

**UNION PACIFIC RAILROAD COMPANY, Defendant.**

**No. 81 0959 CV W 7.**

United States District Court, W. D. Missouri, W. D.

Dec. 4, 1981.

Michael W. Lerner, Stinson, Mag & Fizzell, Kansas City, Mo., for plaintiff.

Charles E. Patterson, Leonard Singer, Watson, Ess, Marshall & Enggas, Kansas City, for defendant.

## MEMORANDUM OPINION AND ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

GIBSON, District Judge.

Bartlett and Company, Grain, plaintiff, moves for a preliminary injunction against defendant, Union Pacific Railroad Company, for its refusal to provide switching service from the Bartlett River Rail elevator to originating points of a number of line haul carriers for some 200 covered hopper cars leased by Bartlett. The motion is denied as the issues fall within the primary jurisdiction of the Interstate Commerce Commission, and Bartlett has failed to demonstrate that preliminary injunctive relief should be granted.

Bartlett operates terminal grain elevators in Council Bluffs, Iowa, St. Joseph, Missouri, Kansas City, Missouri, and the largest, River Rail, in Kansas City, Kansas. Railroad cars loaded at River Rail are shipped to various destinations in the southern and western parts of the country with ultimate destinations in both domestic and world markets. River Rail is served only by the Union Pacific, and only Union Pacific supplies switching service to the several line haul carriers that transport the cars to their various destinations. Cars are delivered to the elevator by Union Pacific, either as a line haul carrier or as a connecting terminal switch carrier. If Union Pacific does not provide switching service, Bartlett can neither receive nor ship rail traffic.

Bartlett utilizes cars provided by a number of sources. Some are owned and provided by various railroads, including Union Pacific. Others are privately owned, and are referred to as private cars. The 200 cars in question in this action are cars owned by Brae Corporation, a financing institution, and are leased to Bartlett. The

cars were formerly provided by Atlantic and Western Railway for Bartlett's use, and were marked ATW 7000 to 7199.

Approximately a year and a half ago Bartlett arranged for a lease of the 200 railroad cars from Brae. Because of the various rules and tariffs applicable to the cars, the cars must be re-marked BRAX 7000 to 7199, to show that the 200 cars in question are private cars.

Bartlett also operates 163 or 164 other private cars; 150 marked PLMX (leased from PLM, Inc.), and 13 or 14 marked TLDX.

All of the 363 or 364 cars are covered hopper cars designed particularly for the transportation of grain.

There was a considerable shortage of covered hopper cars through most of the 1970's and until the end of 1980. The railroads, including Union Pacific, did not have a sufficient supply of the cars to furnish shippers to meet their demand. This was the reason Bartlett contracted 18 months ago to lease the ATW cars through Brae. Beginning in 1981 there was a surplus of such cars. Through October, 1981 Union Pacific had a surplus of approximately 1,000 to 1,300 cars and at the end of October the surplus was approximately 1,000 such cars. On November 9 the surplus was approximately 500 cars.

Re-marking the cars from ATW to BRAX required obtaining authority from certain rail carriers under rules drawn up by the American Association of Railroads, and specifically Circular OT–5–E (Plaintiff's Exhibit 2). This is not a tariff. The markings are also required and authorized by Item 605–D, Tariff PHJ 6007–G (Plaintiff's Exhibit 1), as contained in Supplement 44 to the Tariff, which provides mileage allowances to private car owners when the cars are used.

On October 7, 1981, the 200 ATW cars began to return to the Kansas City, Kansas area from their earlier shipment to points in Mexico. Bartlett sent telexes on October 7 and 8 to Union Pacific concerning temporary authority to allow Bartlett to change from the ATW to BRAX marks. (Plaintiff's Exhibits 3 and 4) Union Pacific was told in both telexes that "Brae, at our request, is making application for OT–5 authority with all railroads including UPR."

Union Pacific answered by telex on October 9, 1981 (Plaintiff's Exhibit 5 and Defendant's Exhibit 3) that the Union Pacific was agreeable to accepting the ATW cars for movement into River Rail and subsequent *empty* movement of the cars, restenciled BRAX, back to connections "providing you or Brae are agreeable to honoring the applicable switching charges." The telex continued, "At this time, due to a surplus of our own grain cars, we are not issuing additional long-term OT–5 authority for grain loading for points served by the Union Pacific." Bartlett replied the same day that it "will be responsible for any applicable switch charges" (Plaintiff's Exhibit 7). It also wrote the same day to the President of the Union Pacific and requested the firm policy of Union Pacific as to how the cars were to be treated at River Rail when UP acted solely as a switch carrier and OT–5 authority had been granted by the originating line haul carrier (Plaintiff's Exhibit 6).

A number of conversations followed this exchange of telexes and the letter, but the Union Pacific decision was to refuse the OT–5 authority and to refuse to provide switching service for the 200 BRAX cars.

Bartlett has obtained the approval to use the 200 cars in question from line haul carriers, including Missouri Pacific, Missouri-Kansas-Texas, Kansas City Southern and Cotton Belt.

Bartlett was at all times willing to pay the required switching charges.

During the period October 9 to October 29 some 120 of the cars were switched out of the River Rail facility by Union Pacific. The parties dispute the circumstances surrounding movement of these cars. The circumstances, however, are irrelevant to the decisive issues in this case.

Bartlett filed this action seeking a temporary restraining order and preliminary injunction on November 4, 1981, and the hear-

ing on the motion for preliminary injunction was held November 9. Pending a decision on the preliminary injunction, the parties agreed that the 15 empty cars at the River Rail facility on November 9 could be loaded, and those and the 6 cars already loaded would be switched out of the River Rail facility to the connecting points of the line haul carriers. No additional cars would be shipped into the facility for remarking.

At the hearing, representatives of the Union Pacific described the reasons for refusal to switch the cars from the facility. W. R. Davis, general superintendent-transportation for Union Pacific, stated that the Brae OT–5 application was sent to Union Pacific for approval and Union Pacific denied the OT–5 application. He stated that it has been the practice of Union Pacific to have OT–5 approval where it provides switching only. Union Pacific's position is that it can grant or withhold the authority even if it is the switch carrier and not the line haul carrier. Davis was cross-examined concerning the authority for Union Pacific's position and stated that, "I don't know that I would rely on a rule. I am just saying that's the way the cars are handled," and further stated with respect to the refusal, "I can't assign and cite you an authority for that."

Kenneth Morrill, director-equipment and service of the Traffic Department of Union Pacific, gave similar testimony. He said Union Pacific has the prerogative to accept or refuse the cars as far as granting OT–5 loading authority was concerned, and, if the cars were not accepted for OT–5 loading authority, they should not be loaded. It was their strong feeling that OT–5 authority was necessary.

Rule 15 of the Code of Car Service Rules-Freight, a mandatory rule enforced by the ICC (Plaintiff's Exhibit 2) relates to requests for cars originating in switching service, and Union Pacific contends it is relevant. Mr. Davis, however, testified that this rule would not have been applicable to private cars.

The Brae application for OT–5 approval for the 200 cars, dated October 7, 1981 (Defendant's Exhibit 1), was filed with the Association of American Railroads and designated several stations assigned for loading, including Kansas City, Kansas, and naming the "originating line haul carriers." The form specifically required that "if cars are scheduled to originate loading on a switching road, name this road also." Under the designation "originating carriers," UP was listed. The application was referred to in the telexes of October 7 and 8 (Plaintiff's Exhibits 3 and 4).

The OT–5 provisions concerning applications are as follows:

(c) Applications for reporting marks should state the name of the owner or lessee, specific car numbers and the station(s) and industry at which loads are intended to originate and the name of the originating line haul carrier(s). The proposed originating carrier(s) will be notified and the Secretary, Transportation Division, will approve or disapprove the application in accordance with the directions of such carrier(s).

(d) After reporting marks are approved, the cars may be used by the owner or lessee for the origination of traffic only at specified station(s) on the carrier(s) that granted such approval to the Secretary, Transportation Division. If the owner or lessee desires to use the cars for the origination of traffic at additional stations or at stations on some other carrier, a new application must be submitted to the Secretary and such applications will be handled in accordance with Paragraph II(c).

(Plaintiff's Exhibit 2, page 4). The provisions of Item 605–D of Tariff PHJ 6007–G are similar in wording (Plaintiff's Exhibit 1), and significant differences will be discussed where relevant.

The position of Union Pacific relating to refusal of the OT–5 authority was described by Mr. Morrill as being based on the language in the second paragraph of both of the above provisions (OT–5 and Item 605–D, Tariff PHJ 6007–G) relating to origination of traffic. There was no question but that Union Pacific was not a line haul carrier for the 200 cars in question.

Mr. Davis stated that shipments beginning at River Rail and switched to a different originating line haul carrier at an interchange point do not originate by the Union Pacific by tariff, but in practice the shipments do. Separate switching charges are provided for the service to the line haul carriers and are published separately. These charges are included in the overall charge made to the shipper by the line haul carrier in the bill of lading.

Item 605–D of Tariff PHJ 6007–G provides for the payment of mileage allowances to shippers when private cars are used and provides that the allowance can be paid only to the company to whom the reporting marks are assigned, provided the cars are properly marked with the assigned reporting marks and car numbers.

Mileage allowance payments are not the only means by which shippers are compensated for furnishing private cars. In many instances, carriers have published rates for the transportation of grain at two separate and distinct levels; one level is applicable to carrier-furnished equipment, and the other level, which is lower, is applicable to private equipment. There are more and more of these favorable private equipment rates in existence.

The dispute concerning whether the carrier or shipper will bear the loss caused by the unused grain hopper cars extends beyond this case involving Bartlett and Union Pacific. A group called "Shippers Committee, OT–5" (SCOT–5) filed a petition for the institution of a rule-making proceeding and other related relief with the Interstate Commerce Commission on August 21, 1981 (Plaintiff's Exhibit 10). Among other relief, the group seeks a ruling that: "It shall be unlawful for any railroad, its agents or associations of railroads, to adopt or follow any rule or practice, or to publish any tariff, which prohibits or limits in any manner whatsoever the use and loading by shippers of private cars," excepting rules regarding mechanical qualifications and safety that apply to railroad covered hopper cars.

The SCOT–5 petition does not specifically refer to switch carriers or to switching services. Bartlett has not joined in the petition "at this time," according to Mr. Harvey.

The SCOT–5 petition described in detail the background of usage of private covered hopper cars. 46% of the 103,000 jumbo covered hopper cars are furnished by shippers and the cars have an aggregate current market value of $3.6 billion dollars. The covered hopper cars shortage for 1972 through most of 1980 is described with supporting graphs and charts (Plaintiff's Exhibit 10, pages 12 to 14). The ownership of jumbo covered hopper cars, Type L–153 (the type involved in this case) owned by Class 1 railroads increased from 50,669 in 1973 to 87,252 in 1981 and similar cars owned by shippers increased from 9,777 in 1973 to 64,315 in 1981.

The petition states that the lowest grain rates published by many railroads were made applicable exclusively to private covered hopper cars (Plaintiff's Exhibit 10, page 14). The mileage allowance payments (such as provided in Item 605–D of Tariff PHJ 6007–G) were enough to defray a large portion of the cost of the cars (Plaintiff's Exhibit 10, page 15). The railroad industry's lack of necessary capital to meet equipment needs is also discussed (Plaintiff's Exhibit 10, page 14).

The Association of American Railroads filed a motion to dismiss the SCOT–5 petition and the Union Pacific joined in this motion.

I.

*Primary Jurisdiction of Interstate Commerce Commission*

Union Pacific argues that primary jurisdiction of Bartlett's claim is in the Interstate Commerce Commission and not this Court.

Primary jurisdiction has been invoked in the following areas:

" . . . where words in a tariff are used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper application, so that 'the enquiry is essentially one of

fact and of discretion in technical matters,' then the issue of tariff application must first go to the Commission." [1]

"Whenever a rate, rule or practice is attacked as unreasonable or as unjustly discriminatory, there must be preliminary resort to the Commission. Sometimes this is required because the function being exercised is in its nature administrative in contradistinction to judicial. But ordinarily the determining factor is not the character of the function, but the character of the controverted question and the nature of the enquiry necessary for its solution. To determine what rate, rule or practice shall be deemed reasonable for the future is a legislative or administrative function." [2]

"... where ... the problem of cost-allocation is relevant, and where therefore the questions of construction and reasonableness are so intertwined that the same factors are determinative on both issues, then it is the Commission which must first pass on them." [3]

■ Under the doctrine of primary jurisdiction, a court must defer to the appropriate administrative agency in "cases raising issues of fact not within the conventional experience of judges, or cases requiring the exercise of administrative discretion...." *Far East Conference v. United States*, 342 U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952). The doctrine is concerned with promoting proper relationships between the courts and administrative agencies. It applies when a claim is originally cognizable in the courts but adjudication of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative agency. *General American Tank Car Corp. v. El Dorado Terminal Co.*, 308 U.S. 422, 60 S.Ct. 325, 84 L.Ed. 361 (1940); *United States v. Western Pac. R. Co.*, 352 U.S. 59, 64, 77 S.Ct. 161,

165, 1 L.Ed.2d 126 (1956); *Mark Aero, Inc. v. Trans World Airlines*, 441 F.Supp. 610 (W.D.Mo.1976). No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether application of the doctrine will further the purposes the doctrine serves. *United States v. Western Pac. Ry. Co., supra.* Uniformity of application and agency expertise are two reasons for the existence of the doctrine. The Supreme Court in *Western Pacific* explained that in earlier cases emphasis was laid on the desirable uniformity which would obtain if a specialized agency initially passed on certain types of administrative questions, but that in more recent cases the expert and specialized knowledge of the agencies involved has been particularly stressed.

■ Two general principles can be gathered from a review of the cases. The court may retain jurisdiction when the issue is whether a rule or practice is applicable or has been violated. *Baltimore & Ohio Ry. Co. v. Brady*, 288 U.S. 448, 53 S.Ct. 441, 77 L.Ed. 888 (1933). The court, however, must defer to the agency when the issue is whether a rule or practice is reasonable or valid. *St. Louis, Brownsville & Mexican Ry. Co., et al. v. Brownsville Navigation District, et al.*, 304 U.S. 295, 58 S.Ct. 868, 82 L.Ed. 1357 (1938); *Pennsylvania R. Co. v. Clark Brothers Coal Mining Co.*, 238 U.S. 456, 469, 35 S.Ct. 896, 900, 59 L.Ed. 1406; *Great Northern Ry. Co. v. Merchants Elevator Co.*, 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922).

Bartlett characterizes the issue as whether a rule or practice has been violated. Although early cases often turned on the pleadings, no longer does the jurisdiction of court or Commission depend on "the whim of the pleader." *United States v. Western Pac. R. Co., supra* 352 U.S. at 69, 77 S.Ct. at 167. The court must determine what the issue or issues really are and then decide

**1.** *United States v. Western Pac. R. Co.*, 352 U.S. 59, 66, 77 S.Ct. 161, 166, 1 L.Ed.2d 126 (1956).

**2.** *Gt. No. Ry. v. Merchants Elev. Co.*, 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922).

**3.** *United States v. Western Pac. R. Co., supra* 352 U.S. at 69, 77 S.Ct. 168.

whether the reasons for the existence of the doctrine of primary jurisdiction are present.

### A. *Reasonableness of a Practice*

Bartlett states the issue narrowly, *i.e.*, Union Pacific is simply refusing to switch private cars when a line haul carrier approves the use of the cars and provides lower rates for such cars. (Post Trial Brief, page 3) Union Pacific views the issue as whether it is required to switch the private cars or has the right to furnish its own.

The evidence at the hearing on the motion for preliminary injunction reveals that the true issue in the case is even more narrow than posed by Bartlett. Bartlett had available to it 164 other private cars (150 PLMX and 13 or 14 TLDX) that could be used at River Rail and which had been granted OT–5 approval by Union Pacific. Union Pacific's refusal to switch the 200 BRAX cars thus is not a complete denial of switching service, but a limitation on it. The issue is whether Union Pacific can refuse to switch the 200 BRAX cars from River Rail, the use of which had been approved by line haul carriers, when Union Pacific had granted approval and was agreeable to switching the other 164 PLMX and TLDX private cars from River Rail. The question is essentially one of the reasonableness of Union Pacific's practice of refusing to switch the 200 cars because of the then existing surplus of its own cars.

Two Courts of Appeals have determined that a railroad's limitation on service poses a question of reasonableness that is within the primary jurisdiction of the Interstate Commerce Commission. These decisions compel the conclusion that Union Pacific's refusal to switch the 200 BRAX cars of the 364 private cars available to Bartlett is a question of reasonableness which should be considered in the first instance by the Interstate Commerce Commission.

In *Elgin Coal Co. v. The Louisville & Nashville R. Co.*, 277 F.Supp. 247 (E.D. Tenn.1967), aff'd 411 F.2d 1043 (6th Cir. 1969), plaintiff coal company sought to enjoin the railroad's reduction in service to three weekly deliveries and pick-ups of cars. The railroad had curtailed service when faced with a refusal by its employees to cross a picket line. Plaintiff argued that any reduction in service violates 49 U.S.C. § 1(11) and (12) as a matter of law. The court noted that the principal issue "is not the refusal of the railway to furnish the shipper any cars. Rather, it is the adequacy of the service being rendered." The court dismissed the action because the primary jurisdiction doctrine required plaintiff's application to the ICC as a prerequisite to the maintenance of the court action.

*Spence v. Baltimore & Ohio R. Co.*, 360 F.2d 887 (7th Cir. 1966), *cert. denied*, 385 U.S. 946, 87 S.Ct. 318, 17 L.Ed.2d 225 (1966), involved a preliminary injunction requiring a railroad to provide a grain business with not less than eight boxcars daily for hauling soybeans from the plaintiff's elevator. Plaintiff argued that he was entitled to railroad service under the Interstate Commerce Act and that jurisdiction to enforce the right to service rested in the federal court under that Act and under 28 U.S.C. § 1337. The court held that the determination of the reasonableness of the railroad's method of car distribution for seasonal loading during a car shortage was within the primary jurisdiction of the ICC. 360 F.2d at 890. Accordingly, the court reversed the trial court's issuance of a preliminary injunction.

In the present case, as in *Elgin* and *Spence*, the adequacy of the service being rendered and its reasonableness are in issue. Primary jurisdiction applies where, as here, the issues involve relevant considerations which the court cannot properly evaluate. See Jaffe, *Primary Jurisdiction*, 77 Harv.L. Rev. 1037, 1046 (1964).

Union Pacific's refusal to switch Bartlett's private BRAX cars was contained in its telex reply of October 9, 1981:

> "At this time, due to a surplus of our own grain cars, we are not issuing additional long-term OT–5 authority for grain loading from points served by the Union Pacific."

It is not clear from the testimony of Mr. Davis that Union Pacific's denial had a ba-

sis in any tariff or authority. Mr. Morrill based it on the similar second paragraphs of Circular OT–5E and Item 605–D of Tariff PHJ 6007–G that the cars could be used for "origination of traffic" only at stations on the carrier that "granted such approval."

█ This lack of clarity in supporting authority for the decision, coupled with the wording of the refusal referring to the surplus of Union Pacific grain cars, permits the inference that the decision was a business judgment based on economic reasons. This conclusion is supported by the American Association of Railroads' reply to the SCOT–5 petition, which states (Plaintiff's Exhibit 11, page 2):

> "It is not OT–5, but the business decision of an individual railroad, which dictates whether private equipment may be used on that railroad."

The cost to the Union Pacific of the unused cars was said to be the same as Bartlett's claimed loss of mileage allowances and lower rates for private cars. The testimony demonstrates that the underlying dispute between Bartlett and Union Pacific is which should bear the loss caused by the surplus of grain cars. This is essentially a question of cost allocation that is within the jurisdiction of the ICC. *United States v. Western Pac. R. Co., supra* 352 U.S. at 69, 77 S.Ct. at 168, and *United States v. United States Steel Corp.,* 645 F.2d 1285, 1292 (8th Cir. 1981). After a long period of car shortage, shippers have invested in private cars, as Bartlett has with the 364 private cars of which Union Pacific will now switch only 164. Now Union Pacific, in common with other railroads, has a surplus of similar cars. This demonstrates the existence of the question of national transportation policy, which must reflect competing interests. A court should refrain from expressing a preliminary view on what national transportation policy permits before the ICC expresses its view. *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Board of Trade,* 412 U.S. 800, 820–21, 93 S.Ct. 2367, 2381–82, 37 L.Ed.2d 350 (1973).

The SCOT–5 petition may or may not involve this particular dispute between Bartlett and Union Pacific. It does not specifically refer to switching service. The relief sought by SCOT–5, that it be unlawful for a railroad to prohibit or limit "the use and loading by shippers of private cars" is broad enough to bar Union Pacific's practice and action with respect to Bartlett's 200 BRAX cars. The broad policy issue involved, and the possible effect on these two parties, demonstrate the need for a determination of national transportation policy that is within the primary jurisdiction of the ICC.

Bartlett contends Union Pacific has an obligation under the Interstate Commerce Act as a common carrier by rail, to switch loaded, outbound, private cars for Bartlett. Bartlett relies on *Peoria & Pekin Union R. Co. v. United States,* 263 U.S. 528, 44 S.Ct. 194, 68 L.Ed. 427 (1923), as authority for the proposition that courts may enforce such switching duties by a mandatory injunction. *Peoria* deals with the propriety of an order of the ICC and involved complete discontinuance of switching service because of nonpayment. The question involved was whether the Esch Act concerning emergency powers of the ICC dealt with switching service, and the conclusion was that it did not. The language on which Bartlett relies is dictum. *Peoria* does not sustain Bartlett on the issue Bartlett poses, when viewed in light of the whole record before the Court. *Peoria* involves complete refusal of switching service and not a limitation on it, which raises a question of the reasonableness of the practice.

Bartlett also relies on *Chicago, Milwaukee and St. Paul R. Co. v. Iowa,* 233 U.S. 334, 34 S.Ct. 592, 58 L.Ed. 988. In *Chicago* the state railroad commission had adopted the coal company's complaint that it was unreasonable for the railroad to refuse to ship and to require that loaded coal cars, shipped into a facility at Davenport by other rail carriers, be unloaded and reloaded in the railroad's cars. The Supreme Court held that intrastate commerce was involved and the regulation of the state railroad commission reasonable and enforceable in the state court. *Chicago* involved the pow-

er of a state railroad commission over intrastate shipments where no regulation under federal authority had been violated. *Chicago* does not support Bartlett's claim that under the circumstances of this case an injunction is proper to compel a railroad to transport grain in cars furnished by the shipper itself.

Bartlett also relies on *Louisville and National R.R. Co. v. F. W. Cook Brewing Co.*, 223 U.S. 70, 32 S.Ct. 189, 56 L.Ed. 355 (1912). There the railroad refused to accept shipments from the brewery in Indiana consigned to points in Kentucky that were dry by local option. By so refusing, the railroad complied with Kentucky law prohibiting such shipments. The United States Supreme Court ruled that the only question was the validity of the Kentucky legislation on which the carrier relied. This was a question of general law for the Court. This holding cannot aid Bartlett in this case.

As shown, Union Pacific's action is not a complete refusal or failure, but rather a limitation on the service, as was considered in *Spence* and *Elgin, supra.* In such circumstances, it is a question of the reasonableness of a practice, which Bartlett admits is within the primary jurisdiction of the ICC. (Post-Hearing Brief, page 2)

### B. *Tariff Construction*

Union Pacific's refusal to switch the 200 BRAX cars from River Rail also involves a question of tariff applicability with respect to those shipments that would call for mileage allowance payments. Mileage allowances are provided in Item 605–D of Tariff PHJ 6007–G (Plaintiff's Exhibit 1). The application procedure in the first paragraph of the tariff requires that it contain "the name of the first line haul carrier or carriers." The second paragraph provides that private cars may be used for "origination of traffic" only on carriers that granted such approval.

Union Pacific is not a line haul carrier of Bartlett's private cars shipped from River Rail. Under the first paragraph of the tariff, Union Pacific's approval is not necessary.

The second paragraph of the procedure in the tariff requires approval of the carrier where cars will be used for "origination of traffic." In this case, does the traffic originate at River Rail, or at the interchange point with the line haul carrier? If it is River Rail, Union Pacific's approval is required under the second paragraph and has been refused. If it is the connecting point on the line haul carrier, Union Pacific's approval is not necessary. The meaning of the phrase "origination of traffic" is thus critical to the meaning of this tariff and as to whether Union Pacific has the right to withhold its approval so as to prevent Bartlett from obtaining the mileage allowance called for in the tariff.

The application procedure is commonly known as the OT–5 procedure and Circular OT–5 has similar language to the tariff. Paragraph II(d) of Circular OT–5 is essentially identical to the second paragraph of the tariff and the considerations discussed above are equally applicable. The first paragraph differs, however. After requiring that the application contain the "name of the originating line haul carrier(s)" the next sentence states "the proposed originating carriers" (instead of the words "the latter" in the tariff) will be notified and direct the secretary to approve or disapprove. Thus, the application procedure under the OT–5 circular raises yet another question, in the meaning of the phrase "proposed originating carrier." Is the "proposed originating carrier" the line haul carrier referred to immediately before this language, or is it a carrier providing switching service to the line haul carrier? If it is the line haul carrier, Union Pacific's approval is not necessary, and if it is the switching carrier, Union Pacific's approval is required.

Union Pacific's testimony is that its practice is to require OT–5 approval even when only switching service is furnished on the private cars. Mr. Davis found it difficult to find authority on which to base this practice but Mr. Morrill based it on the second paragraph of the circular and tariff and the "origination of traffic" phrase. Mr. Davis further testified that, by tariff, traffic originates at the originating point of the line haul carrier but, in practice, it does not.

Bartlett argues that Union Pacific's OT–5 approval is not necessary, relying on

the first paragraph of tariff and circular. In the past, however, Bartlett has submitted OT–5 applications for private cars to the Union Pacific where it was a switch carrier only. In its telexes of October 7 and 8 concerning the 200 BRAX cars, Bartlett told Union Pacific that the application was being submitted to it. By this action, Bartlett recognized Union Pacific's practice.

It is evident the phrase "origination of traffic" is used in a technical sense and that extrinsic evidence is necessary to determine its meaning and application. Union Pacific's practice, Bartlett's recognition of it, and the language of the OT–5 application form are items of extrinsic evidence necessary to determine the meaning of the phrase. At the very minimum, there is a dispute as to whether the words "origination of traffic" are used in an ordinary or special sense. Under these circumstances, preliminary interpretation by the Interstate Commerce Commission is necessary. *United States v. United States Steel Corp., supra* at 1291. While the OT–5 circular is not a tariff, it provides the procedure under which the application is made for private marks required by the tariff. The phrase in the circular "the proposed originating carrier" similarly is used in a technical sense and the same considerations apply.

█ The issue of cost allocation between Bartlett and Union Pacific is involved, as has been previously discussed. The questions concerning tariff construction are intertwined with the reasonableness of the practice of refusing switching service, as discussed *supra,* Part I.A., page 12. These further considerations compel the conclusion that primary jurisdiction is in the Interstate Commerce Commission. *United States v. Western Pac. R. Co., supra* 352 U.S. at 69, 77 S.Ct. at 168; *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Board of Trade, supra,* 412 U.S. at 820–21, 93 S.Ct. at 2381–82.

## II.

### Irreparable Harm

Bartlett asserts in Count II a claim for money damages for additional transporta-

tion costs in the amount of $129,600 per month. The testimony of both John Harvey, Bartlett's transportation manager, and Richard Knadle, Bartlett's Vice President, described the monetary loss. Because of the lower rates available to private cars, additional costs of 13¢ to 25¢ per hundred weight or $200 to $400 per car would be incurred by Bartlett. Bartlett's quoted price for grain includes transportation charge, and Bartlett would lose a part of its profit or margin and incur increased costs. This claim and testimony describes only monetary loss that is compensable by money damages, and does not constitute irreparable harm. *Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 952, 39 L.Ed.2d 166 (1974).

Mr. Knadle further said that Bartlett would have to pass up many contracts and there would be no way to tell what the loss would be. Bartlett would be unable to participate in the southwest market and he specified that private cars from Kansas City to the southwest would be necessary as lines that served the southwest do not serve St. Joseph. The inability to use the cars would cause reduced ability to operate. He could not quantify the loss because he did not know what business would be lost.

Competitive disadvantage has been the subject of equitable relief. *Brennan Petroleum Products Co., Inc. v. Pasco Petroleum Co., Inc.,* 373 F.Supp. 1312 (D.Ariz.1974), presented substantially more detailed evidence of competitive disadvantage in that shortened deliveries of fuel resulted in shortened and odd operating hours which destroyed the ability to keep experienced personnel and to keep the business image to the public as sound and on-going. *Optivision, Inc. v. Syracuse Shopping Center Associates,* 472 F.Supp. 665, 685 (N.D.N.Y. 1979), treated the loss of a business location as a loss of a valuable business asset, and a claim for lost profits that could be computed with a reasonable degree of certainty. The court found no loss of customer goodwill such as occurred in *Interphoto Corpora-*

*tion v. Minolta Corporation,* 417 F.2d 621, 622 (2d Cir. 1969), where the loss of goodwill resulting from lack of a "full line of merchandise" was found to exist. These cases cited by Bartlett do not persuasively show that its testimony has established competitive disadvantage and irreparable harm.

Plaintiff's verified complaint alleges that a total of 30 to 50 railroad cars were loaded each day at the River Rail facility.

Bartlett had available for its use 163 or 164 other private cars, in addition to the BRAX cars. There were 150 PLMX cars that were available "at all of our locations" and Bartlett could get the private car rate on these cars. There were in addition 13 to 14 TLDX cars. Thus, Bartlett was not completely foreclosed from competing in the southwest market with private cars, but the Union Pacific's refusal affected only the BRAX cars being loaded out at River Rail. Bartlett's testimony also acknowledged that the BRAX cars could be used at St. Joseph over the Missouri Pacific to the extent that there were loadings to the same territory as from River Rail. Mr. Harvey stated that inability to use the BRAX cars at River Rail would require that the cars "be moved at substantial additional cost to other elevators outside of the Kansas City area, where they can be loaded." Railroad-owned cars could be used at increased cost.

Thus, Bartlett's claim of irreparable harm from being deprived of the BRAX cars is not a total deprivation of access to the southwest markets or loss of competitive advantage by being deprived the use of the 200 cars. The ability to use the 200 BRAX cars at other locations and the availability of the 163 or 164 PLMX or TLDX cars at River Rail creates a more limited area of possible competitive disadvantage. The loss which would be incurred because of this more limited situation was not the subject of specific testimony by Bartlett. Accordingly, irreparable harm has not been shown. *North Carolina State Ports Authority v. Dart Containerline Company, Ltd.,* 592 F.2d 749 (4th Cir. 1979).

The failure to demonstrate irreparable harm is fatal to Bartlett's motion for a preliminary injunction. *Dataphase Systems, Inc. v. C. L. Systems, Inc.,* 640 F.2d 109, 114 n. 9 (1980). Irreparable harm has been described as the *sine qua non* for all injunctive relief, *Frejlach v. Butler,* 573 F.2d 1026, 1027 (8th Cir. 1979), and has a substantial bearing on the second *Dataphase* consideration of the state of balance of harm. *Rittmiller v. Blex Oil, Inc.,* 624 F.2d 857, 861 (8th Cir. 1980). Plaintiff has a basic obligation to make a clear showing of the threat of irreparable harm.

In view of the failure to establish irreparable harm, the other *Dataphase* considerations of the probability that movant will succeed on the merits and the public interest need not be examined in detail. The cases cited in the discussion of primary jurisdiction demonstrate the particular problems with these two considerations in cases such as this. *Atchison, Topeka & Santa Fe v. Wichita Board of Trade, supra* 412 U.S. at 820–21, 93 S.Ct. at 2381–82.

\* \* \*

Union Pacific has moved to dismiss Bartlett's complaint. Bartlett in its briefing has not replied specifically to this motion. Bartlett has asserted a substantial claim for damages. It is not now clear when a decision will be made on the SCOT-5 petition or what its effect may be on the issues as between Bartlett and Union Pacific. Under these circumstances the motion to dismiss should not be sustained at this time, and the plaintiff should submit further authorities on this issue to the Court within twenty (20) days from the date of this order, taking into consideration the ruling of the Court on the motion for preliminary injunction. It is therefore

ORDERED that plaintiff's motion for preliminary injunction is denied; and further

ORDERED that plaintiff shall submit further authorities to the Court on the issue of dismissal of the complaint within twenty (20) days of the date of this order and that defendant shall submit reply suggestions within ten (10) days thereafter.