In re BREMAN'S EXPRESS COMPANY,
Debtor-In-Possession, Plaintiff,

v.

H & H DISTRIBUTING
COMPANY, Defendant,

v.

DON FISHER SALES
COMPANY, Defendant,

v.

METALCHEM, INC., Defendant,

v.

TILE CITY OF PENNSYLVANIA,
INC., Defendant,

v.

MITCHELL MINING, Defendant,

v.

PROCOM, INC., Defendant.

BREMAN'S EXPRESS COMPANY,
Debtor-In-Possession, Plaintiff,

v.

SORCE, INC., Defendant,

v.

PRYOR CORPORATION, Defendant,

v.

GENCO TRANSPORTATION
SERVICES, INC.,
Defendant.

Bankruptcy No. 84–92.
Adv. Nos. 86–41, 86–33, 86–281, 86–278,
86–53, 86–61, 86–276, 86–79 and 86–42.

United States Bankruptcy Court,
W.D. Pennsylvania.

Jan. 14, 1987.

Teresa M. Strus, Culp, Strus & Wade, Kansas City, Mo., Michael J. Henny, Ravick, Beck & Henny, Pittsburgh, Pa., for plaintiff.

Charles J. Streiff, Wick, Rich, Fluke & Streiff, Pittsburgh, Pa., for H & H Distributing Co., Don Fisher Sales Co., Metalchem, Inc., Tile City Of Pennsylvania, Inc., Sorce, Inc., and Pryor Corp.

Andrew C. Holcomb, Kirkland & Ellis, Chicago, Ill., for Pryor Corp.

Dennis J. Kusturiss, Vuono, Lavelle & Gray, Pittsburgh, Pa., for Procom, Inc.

Stephen J. Laidhold, Lampl, Sable, Makoroff & Libenson, Pittsburgh, Pa., for GENCO Transp. Services, Inc.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Before this Court is the Defendant's Joint Motion to refer issues to the Interstate Commerce Commission ("ICC"), which are identical to issues presently before said agency, based upon the doctrine of primary jurisdiction. Specifically, the Defendants aver that their defenses to the Debtor's Complaints to recover additional freight charges involve the reasonableness of certain rates and practices; accordingly, the Defendants claim said issues should and/or must first be brought before and heard by the ICC. Based upon the briefs submitted, oral arguments offered by the parties, and this Court's own research, we find that a referral of these issues to the ICC is appropriate, and the actions in this Court will be stayed pending the determination of the ICC.

## FACTS

As all of these adversary actions involve the same basic fact pattern, it is appropriate, for the purpose of this Opinion, to offer one general factual setting.

The Debtor is a common carrier, subject to the provisions of the Interstate Commerce Act ("Act"), 49 U.S.C. § 10101, *et seq.*, and the regulations promulgated by the ICC, 49 C.F.R. § 100.1 *et seq.*

In accordance with said statute and regulations, the Debtor caused various tariffs to be filed and published with the ICC. Thereafter, between January 1982 and January 1984, the Debtor entered into agreements with the various Defendants to provide carriage of shipments at rates below those filed and published. The Debtor indicated to the Defendants that these lower rates were or would be appropriately filed and published; however, these lower freight rates have never been included in published tariffs, nor have those previously published been modified to reflect the lower rates charged.

A voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code was filed by the Debtor on January 13, 1984. Subsequent to this filing, Carrier Credit and Collection was employed to audit various of the Debtor's freight billings. This audit resulted in the filing of these adversary proceedings in January of 1986; wherein the Debtor seeks to collect the "undercharges" which is the difference between the published tariff rates and those actually charged to the Defendants.

## ANALYSIS

The Debtor alleges that, pursuant to the Act and several decades of legal precedent, it is not only permitted, but is actually *required* to recover the undercharges from the Defendants. 49 U.S.C. § 10761(a) (1985 Supp.); *Southern Pacific Transportation Company v. Commercial Metals,* 456 U.S. 336, 102 S.Ct. 1815, 72 L.Ed.2d 114 (1982); *Louisville and Nashville Railroad v. Maxwell,* 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853 (1915); *Southern Pacific Company v. Miller Abattoir Company,* 454 F.2d 357 (3rd Cir.1972).

Defendants argue that the true issues to be determined are the reasonableness of the Debtor's filed tariffs and the reasonableness of the Debtor's practice of charging rates lower than those published; and thereafter, instituting a legal action to obtain the difference. Defendants further argue that these initial determinations fall within the "primary jurisdiction" of the ICC, and should be referred to that agency for an advisory decision prior to the continuation of our proceedings. We agree.

The doctrine of primary jurisdiction developed as a means of "promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties". *Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290, 96 S.Ct. 1978, 1986, 48 L.Ed.2d 643 (1976). The Supreme Court has specifically held that the ICC has primary jurisdiction over any matter that "raises issues of transportation policy which ought to be considered by the Commission in the interests of a uniform and expert administration of the regulatory scheme laid down by that Act". *U.S. v.*

*Western Pacific Railroad Company*, 352 U.S. 59, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). *See also, Iowa Beef Processors v. Illinois Central Railroad Company*, 685 F.2d 255 (8th Cir.1982); *Locust Cartage Company v. Transamerican Freight Lines, Inc.*, 430 F.2d 334 (1st Cir.1970); *GMW Inc. v. Flambeau Paper Corporation*, 623 F.Supp. 473 (W.D.Wis.1985).

■ The very fact that the question of referral remains an issue of litigation indicates there exists no fixed formula for determining when the doctrine of primary jurisdiction should apply. The initial questions are whether the reasons behind the doctrine's application are present, and whether the doctrine's purposes will be served by its application in this litigation. *U.S. v. Western Pacific Railroad Company, supra; U.S. v. United States Steel Corporation*, 645 F.2d 1285 (8th Cir.1981); *Bartlett & Company, Grain v. Union Pacific Railroad Company*, 528 F.Supp. 1234 (W.D.Mo.1981).

Many courts have held that the purposes for applying the doctrine are: 1) uniformity and consistency of result; and 2) special expertise of the particular administrative agency. *Nader v. Allegheny Airlines, Inc., supra; U.S. v. Western Pacific Railroad Company, supra; Far East Conference v. U.S.*, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952); *Hansen v. Norfolk and Western Railway Company*, 689 F.2d 707 (7th Cir.1982); *U.S. v. United States Steel Corporation, supra; Bartlett & Company, Grain v. Union Pacific Railroad Company, supra.*

The doctrine has been specifically applied in cases wherein an action, which would otherwise be within this Court's jurisdiction, raises issues as to the propriety of a rate or practice; this is particularly true "whenever enforcement of the claim requires resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body". *U.S. v. Western Pacific Railroad Company, supra*, 77 S.Ct. at 165. *See also, Nader v. Allegheny Airlines, Inc., supra; Far East Conference v. U.S., su-*

*pra; Great Northern Railway Company v. Merchants' Elevator Company*, 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943 (1922); *Hansen v. Norfolk and Western Railway Company, supra; GMW Inc. v. Flambeau Paper Corporation, supra; Delaware & Hudson Railway Company v. Consolidated Rail Corporation*, 562 F.Supp. 175 (N.D.N.Y.1983).

■ The full extent to which the ICC obtains jurisdiction in a case such as that presently at bar was fully discussed by the ICC itself in "National Industrial Transportation League—Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates", *Ex Parte* No. MC–177, — ICC 2d — (October 14, 1986). The pertinent language is as follows:

The question that we are addressing here is whether a shipper must pay the rate established in a tariff where a motor common carrier has negotiated a lower rate and has indicated that the negotiated rate would be the one charged (and therefore presumably filed as a tariff). We believe, in the highly competitive motor carrier industry and economy in general, equitable defenses to rigid application of filed tariff rates should be available on a case-by-case basis and that *our unreasonable practice jurisdiction authorizes such an approach* . . .

*Id.* at 6–7 (emphasis added) (footnotes omitted).

In reaching this determination, the ICC voiced the identical concerns which this Court has:

"In our view, the filed rate doctrine was not intended to condone or reward carriers in the circumstances involved here, especially where carrier actions may constitute fraudulent business practices."

*Id.* at p. 5.

The ICC goes further to explain the manner in which it perceives its function in a factual setting such as that presently before us:

In response to carrier contentions that we are without jurisdiction to order waiver of motor carrier (as opposed to rail)

undercharges, we now set out the rather limited nature of our role in motor carrier undercharge cases—and explain why it comports with the statutory scheme. As some parties point out, the Commission lacks initial jurisdiction to entertain challenges to the reasonableness of motor carrier rates charged in the past, or to order the waiver of undercharges. However, this does *not* mean that we lack authority to address the question of what rate should have been charged by a carrier (the tariff rate, the negotiated rate or some other rate) if the carrier brings an action for undercharges in district court, 49 U.S.C. 11705(b)(3), 11706, and the court refers the question of whether the collection of undercharges would be an unreasonable practice to us under the doctrine of primary jurisdiction . . .

In determining the question whether a motor carrier practice is unreasonable, the Commission will assume its traditional role in unreasonable practice cases, weighing the facts and circumstances in light of its experience and expertise, and aiding the court by making necessary administrative determinations. Consistent with the statutory scheme, the court retains its authority to set the remedy and accept or reject the Commission's conclusion.

In short, we offer to undertake an advisory analysis of whether a negotiated but unpublished rate existed, the circumstances surrounding assessment of the tariff rate, and any other pertinent facts. We would, at a court's request, determine, based on all relevant circumstances, whether collection of undercharges based on the rate contained in the filed tariff would constitute an unreasonable practice and, if a negotiated rate is found to exist, whether this amount is all the carrier should be permitted to collect. The referring court would retain final authority to set the remedy, if any, and review our determination . . .

*Id.* at 7–8 (emphasis in original) (footnotes deleted).

Based upon this thorough explanation, we find that the issues presently before us must first be referred to the ICC, so that we might be aided in our final determination by that agency's special competence and expertise.

However, this Court states for the record that certain issues raised at oral argument will weigh heavily in our final determination. First, it appears clear to us that Congress intended to deregulate and/or reregulate this industry when it enacted the Motor Carrier Act of 1980. The specific purpose of this legislation was to create a favorable climate for competition among carriers. The very foundation for competitive bidding suggests a need for negotiation of rates to be charged. It appears, therefore, that the legislature deemed it appropriate to ease the rigidity of the industry and provide a flexible arena in which business people could conduct their affairs.

This brings us to the second point we wish to stress. While the history of this industry would indicate that an appropriate maxim might be "a tariff is a tariff is a tariff", we do not believe that the recently enacted legislation, together with the subsequent practices in this industry, would support this postulate. On the contrary; it would appear that Congress and the ICC seek to rectify an atmosphere wherein actual fraud might be perpetuated within legal boundaries. This Court cannot and will not condone such a fraud if it is found to exist; nor do we believe that the appellate courts will endorse such a fraud, in light of the practices which have arisen in the aftermath of this deregulation.

An appropriate Order will be issued.