. In re **TOBLER TRANSFER, INC.**, Debtor.

**William H. CHRISTISON, Trustee for the Estate of Tobler Transfer, Inc., Plaintiff,**

v.

**CATERPILLAR INC., Defendant.**

Bankruptcy No. 185–00596.
Adv. No. 86–8184.

United States Bankruptcy Court,
C.D. Illinois.

May 29, 1987.

█

Louis J. Wade, Kansas City, Mo., Andrew Covey, Peoria, Ill., for plaintiff.

F. Louis Behrends, Steven C. Hoffman, Peoria, Ill., William J. Augello, Huntington, N.Y., for defendant.

## DECISION

WILLIAM V. ALTENBERGER, Bankruptcy Judge.

The matters under consideration in this Chapter 7 adversary proceeding are: (1) the motion of the defendant, CATERPILLAR INC., for a determination that this is not a core proceeding; (2) CATERPILLAR'S motion for transfer and reference of issues to the Interstate Commerce Commission (ICC); (3) CATERPILLAR'S motion for leave to file a jury demand; and (4) the motion of the plaintiff, WILLIAM H. CHRISTISON, Trustee (Trustee), to strike the counterclaim.

The facts in this matter are generally uncontroverted. Tobler Transfer, Inc. (TOBLER) filed a Chapter 7 bankruptcy petition in this Court on March 20, 1985. William H. Christison was appointed Trustee. Prior to its bankruptcy, TOBLER was in the business of freight hauling and was subject to regulation by the ICC. From 1979 to 1985, TOBLER provided transportation services to CATERPILLAR and CATERPILLAR paid TOBLER the amounts billed by TOBLER.

On May 5, 1986, the Trustee for the estate of TOBLER TRANSFER brought this action to collect $184,057.41 in freight undercharges. CATERPILLAR answered the complaint and asserted a counterclaim against TOBLER. On October 8, 1986, CATERPILLAR filed a motion for a determination that this is not a core proceeding along with a motion for transfer and reference of the issues to the ICC. The Trustee filed a motion to strike CATERPILLAR's counterclaim. A hearing on all three motions was held on January 21, 1987, and the matters were taken under advisement. CATERPILLAR filed a motion for leave to file a jury demand on February 2, 1987, and a hearing was held on April 13, 1987. That issue was also taken under advisement by the Court.

The first issue to be addressed is whether this adversary action is a core proceeding. The Trustee has cast his complaint as one for turnover of property of the estate. Because such a proceeding is included in the statutory illustrations of "core" proceedings under 28 U.S.C. Section 157(b)(2), the Trustee contends that its action to collect freight undercharges is a core proceeding. The Trustee likens this action as one to collect an account receivable. CATERPILLAR maintains that this is not an action to collect an account receivable but is akin to the action in *Marathon*[1] and should be determined to be a non-core proceeding.

█ Under the Bankruptcy Amendments and Federal Judgeship Act of 1984, the bankruptcy court may hear and render a final decision in core proceedings, while in non-core or related proceedings the Court may only submit proposed findings of fact and conclusions of law to the District Court. However, if the parties consent, a bankruptcy judge may enter a final order or judgment in a non-core proceeding which is subject to appeal to the District Court. 28 U.S.C. Section 157(c)(2). The statute itself lists numerous proceedings which are classified as core proceedings, but the list is merely illustrative and not exclusive. Included therein are "matters concerning the administration of the estate," as well as "orders to turn over property of the es-

---

1. In *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), the Supreme Court found the grant of jurisdiction to non-Article III bankruptcy courts under The Bankruptcy Reform Act of 1978 to be unconstitutional. In *Marathon,* the debtor in possession filed a breach of contract action in the bankruptcy court. The court held that bankruptcy judges could not hear and issue final orders on rights created by state law which are independent of and antecedent to the bankruptcy proceeding. The Congressional solution to the problems raised in *Marathon* was the Bankruptcy Amendments and Federal Judgeship Act of 1984.

tate." "Core" proceedings are generally described as those proceedings which would not exist absent the bankruptcy proceeding. *In re Yagow*, 53 B.R. 737 (Bkrtcy.D.N.D.1985). Merely labeling the proceeding as one to turn over property of the estate is not, however, dispositive of whether the matter is a core proceeding. As one commentator notes:

"The categorization of 'orders to turn over property of the estate' as core proceedings has misled some courts into expanding bankruptcy court jurisdiction beyond that permissible under *Marathon*. For example, it has been held that an action on matured promissory notes given pursuant to a stock purchase plan is a turnover proceeding under section 542 and is therefore a core proceeding. Similarly, an action to recover retentions on a construction contract has been held to be a turnover proceeding. The problem with these cases is that under their rationale, every action brought by a trustee or debtor in possession to recover money or property could conceivably be characterized as a turnover proceeding, effectively contradicting *Marathon*. Each of the cases so holding involved a cause of action owned by the debtor at the time the title 11 case was filed which, by definition, is a 'related matter' not within the meaning of core proceedings." 1 *Collier on Bankruptcy*, para. 3.01[2][b][iii].

Many courts have considered actions to collect accounts receivable to be core proceedings. *In re Nat. Equipment & Mold Corp.*, 60 B.R. 133 (Bkrtcy.N.D.Ohio 1986); *In re Franklin Computer Corp.*, 50 B.R. 620 (E.D.Pa.1985). Other courts have held that a debtor's action to collect an account receivable is not a core proceeding. *In re Arnold Print Works, Inc.*, 54 B.R. 562 (Bkrtcy.D.Mass.1985); *In re Atlas Automation, Inc.*, 42 B.R. 246 (Bkrtcy.E.D.Mi. 1984). These latter courts have perceived that such an action is similar to that involved in *Marathon*. Even those courts which hold that such actions are core proceedings are confronted with "garden variety" accounts receivable where the issues are simple and the amount due is not in

dispute. *See In re Windsor Communications Group*, 67 B.R. 692 (E.D.Pa.1986). That is hardly the case here.

■ The Trustee, relying on the filed rate doctrine, seeks to collect unbilled freight charges. CATERPILLAR fully disputes its liability, alleging that the Trustee's attempts to recover the undercharges constitutes an unreasonable practice under the Interstate Commerce Act. To this Court, resolution of the issue is not unduly complex. But for the Debtor's bankruptcy, would TOBLER's cause of action against CATERPILLAR exist? Clearly the answer is yes. The matter is not a core proceeding.

■ In agreement with this result is *In re Maislin Industries, U.S., Inc.*, 50 B.R. 943 (Bkrtcy.E.D.Mi.1985), a case involving substantially similar facts. There, the court held that the carrier's action to collect freight undercharges was not a core proceeding, concluding that

"[The carrier's] claims involve rights independent of and antecedent to the petition that conferred jurisdiction upon this Court, and are not integral to the restructuring of debtor-creditor rights. Rather, the complaint is before this Court only because [the carrier] has filed a petition for reorganization in this Court."

This Court determines, however, that this case is a "proceeding that is otherwise related to a case under title 11," for if the Trustee's action is successful, the funds will become part of the bankruptcy estate. Accordingly, this Court will submit proposed findings of fact and conclusions of law to the District Court.

■ The second issue to be determined is whether the issues raised in this case should be transferred to the ICC under the doctrine of primary jurisdiction. The Court in *Bradford Sch. Bus Transit v. Chicago Tr. Auth.*, 537 F.2d 943, 949 (7th Cir.1976), discussed the doctrine's application:

"The Supreme Court defined primary jurisdiction in *Far East Conference v. United States*, 342 U.S. 570, 574–575, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952):

[I]n cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.

*Accord, Weinberger v. Bentex Pharmaceuticals, Inc.*, 412 U.S. 645, 654, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973). There is no fixed formula for the invocation of the doctrine of primary jurisdiction and 'the decision whether to apply it depends upon a case by case determination of whether, in view of the purposes of the statute involved and the relevance of administrative expertise to the issue at hand, a court ought to defer initially to the administrative agency.' *Feliciano v. Romney*, 363 F.Supp. 656, 674 (S.D.N.Y. 1973). The policy factors underlying application of the doctrine are: '(1) the desirable uniformity which would obtain if a specialized agency initially passed on certain types of administrative questions, ... and (2) the expert and specialized knowledge of the agencies involved.' *Eisman v. Pan American World Airlines, supra*, 336 F.Supp. [543] at 547."

Section 10701 of the Interstate Commerce Act provides that a rate related to transportation or service provided by a carrier subject to the jurisdiction of the ICC must be "reasonable." 49 U.S.C. Section 10701. Courts have, in the past, consistently held that a shipper must pay the tariff rate, regardless of any negotiated rate. Most recently, however, the ICC has indicated that the filed rate doctrine will no longer necessarily bar equitable defenses, such as those raised by CATERPILLAR here. The Commission explains:

"Today's regulatory environment makes it appropriate for us to take a fresh look at the proper regulatory response to the matter of unfiled negotiated motor carrier rates. The principle that the charges contained in an applicable tariff must be assessed regardless of any agreement between shipper and carrier arose during an era of strict entry and rate regulation. Requiring strict adherence to the tariff rate was intended to avoid intentional carrier misquotation of rates as a means to offer secret discounts to particular shippers. See *Western Transp. Co. v. Wilson*, 682 F.2d 1227, 1230 (7th Cir.1982). In the strict regulatory environment prior to the Motor Carrier Act of 1980, Pub.L.No. 96–296 (MCA), carriers did not enjoy the flexibility they now enjoy to negotiate particularized rate arrangements with shippers. Consequently, they charged essentially the same rates for freight in a given traffic lane, and it generally was not difficult to ascertain the published rate. In that regulatory climate shippers rarely were excused from paying the published rate.

In *Buckeye, supra*, we modified this strict tariff applicability standard for rail carriers because the deregulated pricing atmosphere created in the Staggers Act and the particular facts of the case led us to conclude that a more flexible approach was necessary—and that carriers were unlikely to use rate misquotations as a means to discriminate in favor of particular shippers today. We found there that the railroad had engaged in an unreasonable practice under 49 U.S.C. 10701(a)(1) and 10704(a)(1) because the meaning of the published tariff was not plain to the ordinary user, the applicable rate was misquoted over a long period of time, and the shipper relied, in good faith, on the misquoted rate. In *Seaboard [System R.R., Inc. v. United States], supra*, 794 F.2d [635] at 638 [ (1986) ], the

reviewing court affirmed exercise of our unreasonable practices jurisdiction in this context. It found (*id.*):

> The Interstate Commerce Act ... still embodies the policies of nondiscrimination and uniformity. The primary authority to give effect to those policies, though, is reposed in the ICC.... The Commission in this case merely refused to allow the carrier to collect its undercharge when there was no evidence that the carrier intentionally or knowingly undercharged, when waiving the undercharges was unlikely to encourage carriers to indulge in intentional discriminatory rate misquotations, and when the shipper relied upon the carrier's continuing conduct in misleading the shipper as to the applicable rate under a confusing tariff. The Commission did not abolish the requirement of 49 U.S.C. Section 10761(a) that carriers must charge the tariff rate.

The policy statement we are here adopting will allow us to consider similar issues when raised by shippers using motor carriers. Indeed, as discussed below, this approach is even more compelling in the motor carrier area. Moreover, as we found in *Buckeye*, our former policy of penalizing shippers for carriers' mistakes regardless of the circumstances is unnecessary and inappropriate to deter discrimination under today's statutory scheme.

As noted earlier, the MCA dramatically altered the competitive atmosphere of the motor carrier industry. The relaxation of regulatory requirements and Commission oversight has resulted in intense, new competition. Thousands of carriers have entered the market with broad operating authority and increased pricing freedom. The new business atmosphere requires these carriers to price competitively and on extremely short notice if they are to retain existing traffic or quickly obtain new (including back-haul) traffic.

It is not entirely clear why the problem we are here addressing has developed. Some carriers argue that it is purely inadvertent that tariffs reflecting negotiated rates are not filed. Certain shippers believe the practice is intentional. Whatever the reason, the potential for this problem is significant. We are directed to encourage competitive, innovative, and individualized price and service options to meet changing market demand. 49 U.S.C. 10101(a)(2). As parties such as National Gypsum Co., et al, emphasize, hundreds, or even thousands, of individual motor common carrier rates are negotiated daily. In these circumstances, it can be extremely difficult for shippers to determine, prior to movement, whether the agreed rate is actually on file.

> The question that we are addressing here is whether a shipper must pay the rate established in a tariff where a motor common carrier has negotiated a lower rate and has indicated that the negotiated rate would be the one charged (and therefore presumably filed as a tariff). We believe, in the highly competitive motor carrier industry and economy in general, equitable defenses to rigid application of filed tariff rates should be available on a case-by-case basis and that our unreasonable practice jurisdiction authorizes such an approach."

Ex Parte No. MC–177.[2] (Footnotes omitted.)

This Court believes that the doctrine of primary jurisdiction should apply here. As noted, the issues raised by the Trustee's complaint are at the heart of the ICC's authority and, in the interest of uniformity, should be initially heard by the ICC. This holding is in agreement with a number of decisions of other bankruptcy courts which have specifically considered the issue.

---

**2.** This order was quoted in *In re Breman's Express Co.,* 69 B.R. 356 (Bkrtcy.W.D.Pa.1987) and was cited as "National Industrial Transportation League—Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates", Ex Parte No. MC–177,—ICC 2d—October 14, 1986). That publication is not available to this Court and the citation could not therefore be verified.

*INF, Ltd. v. Spectro Alloys Corp.,* 651 F.Supp. 1405 (D.Minn.1987); *Indiana Harbor Belt Railroad Co. v. Industrial Scrap. Corp.,* No. 85–C–9740 (N.D.Ill.1986); *Southwest Freight Lines, Inc. v. Kaiser Aluminum,* No. C–86–0275 SC (N.D.Cal.1986); *In re Breman's Express Co.,* 69 B.R. 356 (Bkrtcy.W.D.Pa.1987).

Also before the Court is CATERPILLAR's motion for leave to file a jury demand, which the Trustee opposes. Having determined that the issues raised should be referred to the ICC for decision, this Court is unsure what, if any, issues might remain for a jury to decide.[3] For that reason, CATERPILLAR's motion will be taken under advisement until the ICC has issued its advisory opinion. For similar reasons, this Court will reserve ruling on the Trustee's motion to strike CATERPILLAR's counterclaim until the Commission's decision has been received and reviewed.

See written Order.

### ORDER

For the reasons set forth in the Decision filed this day:

IT IS, THEREFORE, ORDERED:

1. The motion of the Defendant, CATERPILLAR INC., for a determination that this is not a core proceeding is hereby GRANTED.

2. The motion of the Defendant, CATERPILLAR INC., for transfer and reference of issues to the Interstate Commerce Commission is hereby granted and the parties shall promptly take all actions necessary to place the questions before the Interstate Commerce Commission.

3. Ruling is reserved upon both the motion of Defendant, CATERPILLAR INC., for leave to file a jury demand and the motion of the Plaintiff, William H. Christison, Trustee, to strike Defendant's counterclaim.

---

**3.** In this Court's view, a jury trial conducted by the bankruptcy court in a non-core proceeding would be impractical. *Matter of Reda, Inc.,* 60 B.R. 178 (Bkrtcy.N.D.Ill.1986). If issues triable to a jury remain, this Court will file a suggestion with the District Court that it withdraw the proceeding.